**In re FIRST COMMODITY CORP. OF BOSTON CUSTOMER ACCOUNTS LITIGATION.**

**No. MDL 713.**

United States District Court, D. Massachusetts.

Sept. 30, 1987.

Edward F. Haber, Boston, Mass., Michael J. Freed, Much Shelist Freed Denenberg Ament & Eiger, P.C., Marvin A. Miller, Washlow, Chertow & Miller, Chicago, Ill., for plaintiff Martin Chapman.

Hugh Scott, Choate, Hall & Stewart, Boston, Mass., for defendants.

## OPINION

WOLF, District Judge.

Because I have been so intensively involved in this and because the establishment of the escrow and other matters do suggest the desire to decide this as promptly as humanly possible, I'm going to render this decision orally. As I hope the detail of it will reflect, the oral nature does not suggest that this decision has been reached at all casually. In fact, it is the result of months of participation and scrutiny of the evolving proposed settlements.

Basically, I'm now asked to do two things: one, to conditionally certify two classes for settlement purposes only under Federal Rule of Civil Procedure 23(c)(1); I'm also asked to authorize the distribution of the proposed class settlement to class members for their consideration as a possibly reasonable, fair, and adequate resolution.

I have concluded that conditional certification of the proposed classes is appropriate. I have also concluded that the proposed settlement merits consideration by the class members as a possibly fair, adequate, and reasonable resolution of this case. At the fairness hearing that will be scheduled, I will again consider the propriety of class treatment, as well as the fairness of the settlement to the now conditionally certified class.

To understand the conclusions that I've reached, some understanding of the procedural history of this matter is useful. In February 1987, the Panel on Multi-district Litigation assigned to this Court numerous civil cases against First Commodity Corporation of Boston and related individuals, brought by customers basically alleging fraud. A number of those cases were styled as class actions.

At the initial hearings which I held after transfer of the first cases to me, I entered

a temporary restraining order against Don and Richard Schleicher enjoining them from distributing assets which they received from First Commodity Corporation since the beginning of 1986.

In addition, I was promptly presented with motions to appoint a receiver for First Commodity Corporation, to preliminarily enjoin the transfer or dissipation of assets which the Schleichers had received over many years from First Commodity, and to certify a class action in these matters.

At the same time the parties and Court recognized that there are important related parallel proceedings to the civil litigation before me. The Commodities Future Trading Commission ("CFTC") and National Futures Association ("NFA") were in the process of conducting reparation and arbitration proceedings brought by customers seeking actual damages on claims similar to those in certain civil cases before me. In addition, the CFTC was conducting an administrative investigation which could result in substantial fines, conceivably fines of multi-millions of dollars against First Commodity Corporation.

In addition, the MidAmerican Exchange ("Mid–Am") had imposed a fine of $3.5 million on First Commodity Corporation of Boston. In the course of this litigation, the CFTC remanded to the MidAm Exchange for their consideration the question of whether the fine in that amount, as opposed to a fine in a lesser but, nevertheless, still substantial amount, was appropriate.

In addition, it was known that a criminal investigation being directed by the United States Attorney's Office in Chicago concerning First Commodity Corporation of Boston was being conducted. At my invitation, representatives of the CFTC, the NFA, the MidAmerican Exchange, and the U.S. Attorney's Office appeared before me to discuss, to the extent they appropriately could, the substance and status of the matters that they were involved in and their potential impact on this multi-district litigation.

Early on I was presented with a request by the defendants to stay this multi-district litigation because of the pendency of the criminal investigation. I denied that request. I was also presented with a number of questions or disputes concerning discovery relating to plaintiffs' motions for preliminary injunction and appointment of a receiver for First Commodity. I resolved those disputes and ordered expedited discovery so prompt hearings on the motions for equitable relief could be commenced.

As a result, plaintiffs obtained voluminous discovery in this case promptly. The MidAmerican Exchange had conducted a lengthy investigation and significant evidentiary proceedings. Pursuant to my orders, the plaintiffs obtained a significant amount of the information developed in connection with the MidAm proceedings.

In addition, the plaintiffs discovered from First Commodity information generated by the CFTC in the course of its efforts. As a consequence there was considerably more information discoverable than could usually be expected to be quickly available in a matter of this sort. The information available from the CFTC and the MidAm Exchange are distinctive features of this multi-district litigation at the present time.

In connection with the motion for preliminary injunction and appointment of a receiver, the parties filed very lengthy and exhaustive briefs on numerous issues related to the merits of this case. In addition, there was submitted voluminous evidence—box after box, foot after foot. Those briefs and that evidence was carefully studied by me in preparation to commence the hearings on preliminary injunction and receiver.

Those evidentiary hearings and related legal arguments began and lasted several days. I suspended those hearings because there was some additional discovery which I thought would facilitate the presentation and decision of the pending motions.

During the hiatus in the evidentiary hearings, the parties began to discuss settlement and so informed the Court. To promote and facilitate exploration of the settlement, I organized a series of meetings in Boston. At the request of the

parties, I invited and obtained the participation of the MidAmerican Exchange and the National Futures Association in the parties' settlement discussions. I also invited, but did not obtain, the participation of the CFTC in those settlement discussions.

The CFTC, as I mentioned earlier, is conducting administrative proceedings which could result in significant fines against First Commodity. That is entirely separate from these proceedings.

In July 1987 the parties reached and informed the Court of the terms of settlement they wished the Court to consider and preliminarily approve for consideration by the customers of First Commodity. That settlement included the pending dispute between First Commodity and the MidAm Exchange. That settlement called for the payment by certain defendants of $5.3 million. Of that amount, $1 million would be provided by the MidAm Exchange from the total fine of $1.5 million that it would impose to settle its dispute with First Commodity.

Significantly, the settlement was proposed as a Rule 23(b)(1) mandatory class action, which would have resulted in the resolution of all conceivable customer claims for actual out-of-pocket damages and other recovery, such as punitive damages or multiple damages. No customer would have been afforded the opportunity to opt out with regard to any possible claims.

In addition, the proposed settlement in July, 1987 was contingent upon the Court ordering a stay of reparation and arbitration proceedings before the MidAm Exchange and the CFTC pending possible final approval of the proposed settlement and becoming a permanent stay if the proposed settlement were approved.

Finally, the settlement proposed in July was contingent upon the Schleichers satisfying first the plaintiffs and then the Court that their net worth did not exceed $9 million.

When informed of this proposed settlement, the Court directed the parties to prepare briefs and to inform counsel in the tag-along civil cases of it. In addition, the NFA and the CFTC were informed.

In August, 1987 the Court held a hearing on the possible fairness of that initially proposed settlement. Only two objections had been filed. One was on behalf of several customers with pending reparation and arbitration proceedings. The Court, however, scrutinized that proposed settlement and, as a result, expressed some significant concerns about its propriety. There was a certain synergy between those principal concerns. The Court had a concern that is inherent in the present posture of the case regarding the propriety of addressing settlement before the issues of class certification were decided on the merits.

The Court had a very significant concern about the mandatory nature of the proposed settlement, which would have precluded anybody from opting out or pursuing reparation and arbitration proceedings particularly. The Court had a closely related concern about the propriety of temporarily staying pending reparation and arbitration proceedings. In addition, neither the plaintiffs nor the Court were satisfied with the defendants' efforts up to that point to verify the limited net worth of the Schleichers.

The hearing in August lasted several days. In response to the concerns expressed by the Court, the parties renegotiated their proposed settlement in an effort to respond. That led to a new proposed settlement which had, and with one material deletion still has, the following salient features. The salient points of the proposed settlement provide that:

(1) A conditional mandatory class be certified for settlement purposes only for all damages as to certain individual settling defendants, including the Schleichers, and as to First Commodity for all damages other than out-of-pocket damages; that is, for all damages in the nature of punitive damages and treble damages.

(2) An opt-out class be certified pursuant to Rule 23(b)(3) for settlement purposes only as to First Commodity and its sales

agents for out-of-pocket damages including interest.

(3) The settling defendants pay $5.3 million to members of the class and receive a release of the claims and causes of action asserted or which could have been alleged in the customers' Complaints.

(4) The settlement funds and earned interest, less attorneys' fees and costs, be distributed to the class in the proportion of each class member's recognized net loss to the aggregate recognized net loss of all of those who filed proofs of claim.

(5) The class have the option of abrogating the settlement in the event that the aggregate net worth of Don and Richard Schleicher exceeds $11 million, or the class could elect instead to receive 25 percent of the excess over and above $1 million.

(6) The affidavits recently submitted by Don and Richard Schleicher attesting to their net worth would be verified by accountants mutually selected and instructed by counsel for the Schleichers and counsel for the class; the accountants will submit appropriate acceptable net worth statements concerning the Schleichers.

(7) The net worth of First Commodity would be evaluated by an accounting firm which will submit an appropriate net worth statement of First Commodity as well.

(8) The defendants may abrogate the settlement if the payment of claims from opt-out class members or those who obtained final judgments from reparation proceedings, arbitration proceedings or civil courts exceed a previously agreed to dollar amount.

The proposed settlement was conditioned on the Court ordering a temporary stay of all reparation and arbitration proceedings while the proposed settlement was under consideration.

When presented with that renegotiated and revised proposed settlement the Court ordered that notice be given to counsel in all the tag-along civil actions. In addition, the Court ordered that the CFTC and the NFA be given notice and be asked to in-form the customers with pending reparation or arbitration proceedings of the proposed settlement. Those customers with civil actions and reparation actions or arbitration proceedings were invited to object to any or all features of the proposed settlement.

The parties briefed the merits of the proposed settlement. The NFA and CFTC were invited and accepted the invitation to brief their opposition to the request of the stay. In addition, many objections were received from customers with reparation and arbitration proceedings relating to the stay. A smaller number of objections were received from customers with pending civil litigation.

On September 22 and 23, 1987, I conducted hearings concerning the then-current proposed settlement. I heard from parties, I heard from counsel for the objectors. I also heard from counsel on behalf of the CFTC and the NFA.

I had scrutinized the proposed settlement prior to that hearing. I had some concerns regarding it. I expressed those concerns. In some instances counsel persuaded me that those concerns should not be serious concerns. In other cases counsel and their clients were willing to respond to the Court's concerns.

A major issue at the hearing last week involved the proposed temporary stay of the reparation and arbitration proceedings, which was a condition of the proposed settlement then required by the defendants. After hearing argument on that issue, I denied the request for a stay, or indicated that I would deny it. As I said at that hearing, I believe that if, as I'm going to do today, the Court conditionally certifies a class, it has the authority to order a stay of reparation and arbitration proceedings. I decided, however, that it was not on the record before me appropriate to exercise that authority now. More specifically, I indicated that I did not find the Court's flexibility and authority to decide this pending civil litigation to be seriously impaired now by the reparation and arbitration pro-

ceedings.[1] To put it another way, the normal requirements for equitable relief, including imminent and irreparable harm, do not appear to me now to be met.[2]

In addition, as I said last week, I was influenced by considerations of comity and general prudential concerns relating to injunctions which would have the effect of arresting proceedings being conducted by the CFTC, an agency of the Federal Government. I did, however, indicate a willingness to enlarge the order entered by Judge Shadur in Chicago to require Court approval for First Commodity to pay judgments as well as settlements.

At that point it was recognized that my decision with regard to the stay jeopardized the proposed settlement. Upon reflection, however, the defendants agreed to waive the stay as a condition of the proposed settlement. Rather, the defendants requested that the Court allow them to settle and pay pending reparation, arbitration and civil litigation proceedings without diminishing the $5.3 million fund which the proposed settlement would establish, without diminishing the net worth of the Schleichers and First Commodity which might under the proposed settlement operate to increase above $5.3 million the amount of the settlement fund, and without counting against the total amount of payments to settle claims which would under the proposed settlement give First Commodity and the other defendants the option to withdraw from the settlement agreement.

In addition, the defendants ask that I enter an order requiring this Court's approval to pay all judgments, other than those which might be resolved pursuant to the newly requested authority which I just described. The effect of defendants' request is to allow the arbitration and reparation proceedings to continue and to add money to the $5.3 million previously agreed to to be applied to satisfy the complainants. The plaintiffs endorse the defendants approach. Counsel for the CFTC, Mr. Maillie, also endorsed this approach.

Thus, I am today acting on the August proposal as modified on September 23rd. The material difference is the stay is no longer a condition of the proposed settlement. Rather, the defendants are to be allowed to settle existing reparation and arbitration proceedings as well as civil litigation and to make those payments without in any way diminishing the amount to be available to the classes being conditionally certified today.

The terms of the settlement being discussed today are reflected in the amended stipulation of settlement which was filed with the Court yesterday. As the parties through their counsel represented earlier today, the forms of the orders to implement the stipulation of settlement remain at the discretion of the Court. There are, however, certain essential terms which must be included for the defendants to be obligated to continue. If, for some reason, any of those essential terms are not included, the defendants would at an appropriate point have the option, but not the obligation, to withdraw from the settlement.

At this point, I've been called upon to conditionally certify a class for settlement purposes. Prior to having made a decision regarding class certification on the merits, the Manual on Complex Litigation, 2nd, urges caution in doing so.[3] I have been cautious. The parties may, perhaps, reasonably regard me as having been painfully cautious since we have been at this for several months and through several hearings.

As the Manual on Complex Litigation recognizes, there are benefits to be obtained by conditionally certifying a class for settlement purposes.[4] Classic among those benefits, and existing here, is the fact that money that might otherwise be spent contesting Rule 23 certification may be made available to provide additional ben-

---

1. *In re Baldwin–United Corp.*, 770 F.2d 328, 335 (2d Cir.1985); *James v. Bellotti*, 733 F.2d 989, 993 (1st Cir.1984).

2. *James*, 733 F.2d at 993.

3. *Manual for Complex Litigation 2d* § 30.45 (2d ed. 1985).

4. *Id.*

efits to the class. In addition, early settlement should reduce the fees awarded to class counsel from the settlement fund. Moreover, although common questions may predominate and justify a class if the case is settled, the standards of Rule 23(b)(3) may not be met if the case must be tried.

As the Manual compellingly reminds the Court, however, there are also risks in acting on a proposed settlement in the present posture of this case.[5] As I will describe later, however, many of those risks are diminished by some unique characteristics of this case. Those risks include the fact that the fairness of the settlement may be very difficult to assess. No one may know how many members are in the class, how large their potential claims are, what the strengths or weaknesses of the parties' positions are, or how much the class members will benefit under the settlement. Thus the Manual indicates that lacking this information the Court should be wary in presenting the settlement to the class.

As I said at length when the initial settlement, which was exclusively a mandatory settlement under Rule 23(b)(1), was presented, I think that the risks inherent in proceeding on settlement at this point are magnified when a mandatory class is involved. A mandatory class doesn't permit individuals to judge the desirability of settlement for themselves and opt out if they find it undesirable.

There are, however, several cases in which settlements have been preliminarily and then finally approved prior to a decision on class certification on its merits. *Greenman*[6] and *Bush*[7] are two such cases. That was my major concern regarding the initial settlement proposed in July.

▌ As Judge Henry Friendly and Judge John Minor Wisdom have eloquently and, I think, persuasively stated on behalf of the

Second and Fifth Circuits, however, the absence of a prior class certification is by no means an absolute bar to approving a proposed class settlement preliminarily.[8] In *Weinberger v. Kendrick*, Judge Friendly quoting Judge Wisdom's decision *In Re Beef Industry Antitrust Litigation*, said the following which is relevant here:

"A blanket rule prohibiting the use of temporary settlement classes may render it virtually impossible for the parties to compromise class issues and reach a proposed class settlement before a class certification. Such a firm restriction does not appear necessary or desirable. The hallmark of Rule 23 is the flexibility it affords to the courts to utilize the class device in a particular case to best serve the ends of justice for the affected parties and to promote judicial efficiencies. Temporary settlement classes have proved to be quite useful in resolving major class action disputes. While their use may still be controversial, most Courts have recognized their utility and have authorized the parties to seek to compromise their differences, including class action issues through this means."[9]

I would note, although, as I will explain, I think this is only applicable to part of the proposal before me, Judge Wisdom also observed in the *Beef* case that it was altogether proper and consistent for the Court to certify a class for settlement purposes, while it might have more difficulty reaching this determination in a different context.[10]

I also take very seriously, however, Judge Friendly's admonition that district judges who decide to employ the procedure of preliminarily approving a class settlement before deciding the class action issues on the merits are bound to scrutinize the fairness of the settlement agreement with

---

**5.** *Id.*

**6.** *In re Dennis Greenman Securities Litigation,* 622 F.Supp. 1430 (S.D.Fla.1985).

**7.** *Bush v. Rewald,* No. 840881, Order (D.Hawaii July 31, 1986).

**8.** *Weinberger v. Kendrick,* 698 F.2d 61, 72–73 (2d Cir.1982); *In re Beef Industry Antitrust Litigation,* 607 F.2d 167, 177–78 (5th Cir.1979).

**9.** *Weinberger,* 698 F.2d at 72–73, *quoting In re Beef,* 607 F.2d at 177–78.

**10.** *In re Beef,* 607 F.2d at 178.

even more than the usual care.[11] There has to be careful attention paid to whether there has been any collusion or undue pressure by the defendants on would be class representatives. There also has to be a clearer showing of the settlement's fairness, reasonableness and adequacy, and the propriety of the negotiations leading to it.

To discharge my duties in this case, I have and intend to continue to use two separate standards, one for the proposed class to be certified pursuant to Rule 23(b)(3) and another for the proposed mandatory class under Rule 23(b)(1).

█ With regard to the opt-out class which was proposed pursuant to Rule 23(b)(3), I believe that the issue of whether class treatment is appropriate is one that the parties can settle or compromise. If there are customers who do not care for that resolution or possible compromise, they can opt out of that class. I believe it may be easier to get a settlement class pursuant to 23(b)(3) than to obtain, if there is a dispute, certification of a litigation (b)(3) class.

With regard to the proposed mandatory class under Rule 23(b)(1), which would dispose of claims for multiple or punitive damages by every former customer of First Commodity without an opportunity for them to opt out, I believe that heightened scrutiny is appropriate. Since people cannot opt out of this class, they will have their rights resolved by this Court's decision, subject to possible appeal, and, in my view, a relaxed standard of review is not appropriate. I intend to rigorously apply the standards that have been developed with regard to the propriety of initially and then ultimately certifying a (b)(1) mandatory class.

At this time I believe that I am in a good position to scrutinize the present proposed settlement. The parties have had very significant discovery, particularly discovery relating to defendants. Plaintiffs acquired the results of lengthy MidAm investigations and proceedings. They also acquired meaningful information from the Commodities Future Trading Commission investigations and proceedings. They have a degree of discovery which would usually take years to develop if the plaintiffs did not have these other sources. A considerable amount of the results of that discovery was furnished to this Court in connection with the suspended hearing on the motions for preliminary injunction and for appointment of a receiver.

In addition, I have closely observed the settlement process. I have also had the views of the CFTC's as *amicus* with regard to the proposed settlement. I have heard from objectors. I have seen and assessed the evolution of the proposed settlement in response to reservations I have expressed with regard to predecessors of the settlement I am now acting on. Therefore, I feel I am in a position to make an informed decision on the issues being decided today.

Today I am conditionally, for settlement purposes, approving and certifying two classes. In doing that, I first address the requirements of Rule 23(a) which must be met. Before a class action may be certified, the four prerequisites of Federal Rule of Civil Procedure 23(a) must be satisfied. They are frequently referred to as numerosity, commonality, typicality, and adequacy of representation.

Numerosity presents a straightforward issue that is not disputed. The customers to be included in the proposed classes number in the tens of thousands, perhaps as many as 50,000. This plainly satisfies the numerosity requirement.

With regard to commonality, for the purposes of Rule 23(a) there must be questions of law or fact common to the class. With regard to Rule 23(b)(3), those common issues must be found to predominate. There are, as I will describe in a moment, many common questions of law and fact presented by this multi-district litigation. Whether they would, if a dispute continued, be deemed to predominate appears to be a competitive question. This, in my mind however, is an issue that the parties may

---

11. *Weinberger,* 698 F.2d at 73.

properly seek to compromise and settle. People who disagree may opt out.

The common questions presented by this case include, but are not limited to, the following:

In effect, the plaintiffs allege and offer evidence that all members of the proposed class or classes are former customers of First Commodity. In addition, more significantly, they allege and provided evidence supporting the allegations that First Commodity has operated as an enterprise oriented to luring unsophisticated, unsuitable investors to invest in the very risky commodities markets through First Commodity. First Commodity, as part of a common course of conduct that used false and misleading ads to identify the prospects, made oral statements of a standardized character which were false and misleading to those prospects, and thus caused investors to invest without adequately appreciating the risks they were undertaking.

As part of this alleged and evidenced common course of conduct, First Commodity took a large management fee, usually about 40 percent, off the top of a customer's investment. So, in effect, investors had little depth to ride out the vicissitudes of the commodity markets when their investments were highly leveraged. In fact a majority lost a significant part or all of their highly leveraged investments.

Common issues raised by the parties in this case also significantly relate to the defenses of First Commodity. First Commodity asserts, and again there is evidence, that all or virtually all of its customers signed disclosure statements meeting the requirements of Federal law. Prior to signing them they were contacted and questioned by a compliance officer of First Commodity, which refused to let some people deemed unsuitable invest in commodities through that company.

In response, the plaintiffs allege and offer evidence that First Commodity Corporation salesmen, as a part of their standard operation, improperly induced prospective customers to ignore those warnings, to not read those disclosure forms, and to mislead the compliance officers regarding their suitability and sophistication. In their complaints, the plaintiffs commonly allege that First Commodity used a standard course of conduct involving false and misleading statements to obtain investments. The defendants emphasize their strict compliance with Federal law. These issues are common throughout the class.

The evidence presented suggests that this case may very well be distinguishable from those in which the varying nature of oral statements made class treatment inappropriate.[12] There is evidence here that suggests that First Commodity salespeople used standardized oral statements as part of a common course of conduct.[13] That evidence includes, but is not limited to, evidence which would show that First Commodity's vice president of sales, Mr. Connolly, taught new salesmen a play that they were to perform with prospective customers. A transcript of one of his presentations to new salesmen includes the following statements by Mr. Connolly:

"Now, I'm going to show you a way today where a hundred million dollars was raised last year, but there's one basic thing you've got to do: You've got to say the same thing on the phone every time you get on the phone. Anybody that's ever been to a great play, not a good one, not a half decent play, but a great play, they don't change the lines every play. You can go back there one year later and it is the identical play that they had before. I'm not looking for you to think. I'm looking for you to come in here and do what we tell you to do. Don't think of how it should be. We've been working at it for five and a half years, through blowouts and every other thing, to get this down so you can walk in here and earn a lot of money not struggling. As soon as you start thinking, you'll start struggling. I'm not looking for you to think. I want you to listen to what

12. *See In re Scientific Control Corp. Securities Litigation,* 71 F.R.D. 491, 499–505 (S.D.N.Y. 1976), and cases discussed therein.

13. 4 *Newburg on Class Actions* § 22.48 (2d ed. 1985).

I have to say here. I come back here three months, two months from now, and I walk in and I walk around, I want to be listening to the play."

The evidence presented also indicates that that so-called play was performed in many First Commodity offices, at least, throughout the country.

In many respects I find the case as now presented to be substantially similar to the case of *Rishcoff v. Commodity Fluctuation Systems, Inc.*,[14] in which class treatment was deemed appropriate. As the Court there recognized, courts have refused to certify Rule 23(b)(3) classes when the record reveals a series of highly individualized presentations by brokers to their clients. In *Rishcoff*, however, salesmen were provided with a script that was not read verbatim to each prospective investor; principal elements of a standardized pitch, however, remained remarkably consistent. They're also remarkably familiar in the context of this case. Soliciting brokers in *Rishcoff* stressed they were promoting investments which required only a single fee which would be economical over the long run. They consistently represented their experience in identifying undervalued commodities, which would rise. Investors were consistently urged to act quickly to take advantage of an existing low price.

As the Court said in *Rishcoff*, in words that are also applicable here, "These consistent elements of the broker solicitation, coupled with the large number of persons who invested on the basis of telephone contact by brokers with whom they had no prior relationship and the relatively large number of different brokers involved, suggests that the defendant had developed a successful marketing strategy that was applied to all potential customers."[15]

The record in this case deals with enough of a common nucleus of facts, the brokers' approaches of potential investors, to make it appropriate for class treatment.

In this case, Mr. Connolly's play was the functional equivalent of the script. Indeed, there was evidence that some scripts were used. We have again a standard pitch, a one-time fee. And it is appropriate to conclude that there was a marketing strategy applied to all potential customers, at least for the present purposes of approving preliminarily class certification and distribution of a proposed settlement.

The next issue presented by Rule 23(a) is a question of typicality. "Typicality refers to the nature of the claim of the class representatives and not to specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."[16]

The evidence in this case indicates that for present purposes the named plaintiffs, that is, the class representatives, are typical of the class they seek to represent.

Finally with regard to Rule 23(a) is the issue of the adequacy of the representation. This issue is particularly important where, as here, a temporary settlement class is being conditionally certified. The adequacy of representation goes directly to the integrity of the process by which the proposed settlement was developed.

I find that the representation of the class has been and is adequate. I base this conclusion on a number of factors. In this case there is no conflict among the plaintiffs or their counsel vying for designation as class representatives or class counsel. When this multi-district litigation was assigned to me, I established the plaintiffs litigation committee and the parties and their counsel have acted in unison.

With regard to this litigation, and to the evolution of the settlement now proposed, there has been no opportunity for the de-

---

**14.** *Rishcoff v. Commodity Fluctuation Systems, Inc.,* 111 F.R.D. 381 (E.D.Pa.1986).

**15.** *Rishcoff,* 111 F.R.D. at 384.

**16.** *Berenson v. Faneuil Hall,* 100 F.R.D. 468, 470 (D.Mass.1984), *quoting Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y. 1981).

fendants to collude with one party or one party's counsel to buy off anybody in return for class treatment on terms favorable to the defendants.

As I said earlier, the plaintiffs' claims are typical of those of the class. The settlement would treat them the same as other class members. There is no premium that they will obtain in the settlement. Indeed, it has been agreed that First Commodity may not settle with them specially, although I am authorizing First Commodity to settle with other former customers specially if they deem it appropriate to do so.

Plaintiffs' counsel are experienced in matters such as this class action security litigation. A number of them were counsel in many of the prominent reported cases. I have observed them to be vigorous in their representation of the plaintiffs. I do not perceive any evidence of collusion with the defendants.

As I have noted on other occasions, class counsel do have an interest in class certification being obtained. This enhances the likelihood that they will be paid some amount as reasonable attorneys' fees and be paid sooner rather than later. This interest has caused me to scrutinize the proposed settlement with particular care. There is no evidence that class counsel have been improperly influenced by their possible interest in getting paid, or getting paid sooner rather than later.

In any event, as I reflected on it, I do not think that the interest that class counsel have in getting paid is a conflict of interest with the class they seek to represent. Class counsel may have an interest in an early class settlement because litigation will diminish, if not deplete, the defendants' resources. Class members, however, have the same interest. They can object to class treatment or opt out if they do not like the proposed reconciliation of their interests, at least with regard to their actual damages.

So, for those reasons I'm satisfied that, at least for present purposes, the requirements of Rule 23(a) are met.

Now I'm being asked to establish what I understand to be two classes on a conditional basis for settlement purposes only. One of those is the mandatory class under Rule 23(b)(1)(B). Rule 23(b)(1)(B) provides in pertinent part that: "An action may be maintained as a class action if the prerequisites of Subdivision (a) are satisfied and, in addition, the prosecution of separate actions by or against individual members of the class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not party to the adjudications or substantially impair or impede their ability to protect their interests."

As the cases and commentators, as well as the Advisory Committees Notes, indicate a limited fund case is the most typical type of case in which Rule 23(b)(1)(B) treatment is deemed appropriate.[17] The danger is that a plaintiff who gets his case decided relatively early will obtain a judgment which depletes assets which would otherwise be available to later plaintiffs or class members with equally meritorious claims. There is a particularly undesirable danger if multiple damages or punitive damages might be recovered at the expense of the ability of other plaintiffs in later cases to recover their actual damages.

In this case, I'm being asked to certify conditionally a mandatory class with regard to only certain defendants and for only certain purposes. There are named individual defendants, including the Schleichers. They have assets which by ordinary terms are substantial. They are

**17.** *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 725 (E.D.N.Y.1983); *Coburn v. 4–R Corp.,* 77 F.R.D. 43, 45–46 (E.D.Ky. 1977), *mandamus denied sub. nom., Union Light, Heat & Power Co. v. U.S. District Court,* 588 F.2d 543 (6th Cir.1978), *cert. denied,* 443 U.S. 913, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979);

*In re Bendectin Products Liability Litigation,* 749 F.2d 300, 305–06 (6th Cir.1984); 1 *Newburg on Class Actions* § 409 (2d ed. 1985); 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1774 (1986); Advisory Committee Notes on 1966 Amendment to Fed.R.Civ.P. 23.

apparently, however, not infinite. Therefore, they are limited.

The claims for which a mandatory class is today being preliminarily approved are claims against First Commodity and certain individual defendants for damages in excess of actual damages only. Multiple damages and punitive damages are the examples that are most prominent.

It is important to note that any class member's claims for out-of-pocket losses, which are all that can be recovered in reparation and arbitration proceedings conducted by the CFTC or NFA, are not in the mandatory class. Individuals who wish to seek to recover their actual damages can opt out of the (b)(3) class being conditionally certified today and pursue reparation and arbitration proceedings to recover those actual damages.

The dual approach to dealing with punitive or multiple damages on the one hand, and actual damages on the other hand, is the approach that was employed in the *In Re Agent Orange* product liability litigation.[18] At this point it seems also to be appropriate here, although it is premature to make a final judgment on that point.

In order for (b)(1) treatment to be appropriate, there must be a real risk that the type of harm contemplated by the Rule will occur.[19] It is not necessary, however, that it be certain that type of harm will occur. The rule speaks of a "risk."

In making this point I recognize that I am in this respect differing from what may be the view of the Ninth Circuit as expressed in the *Dalkon Shield* cases.[20]

In addition, in order for a limited fund to be a vehicle for a (b)(1) certification, there must be evidence and eventually a factual finding of both a limited fund and a real risk that it will be exhausted to the detriment of plaintiffs with meritorious claims. There is evidence that has been presented

to me suggesting such a limited fund. The Schleichers have filed affidavits relating to their net worth. In addition, financial information relating to First Commodity was submitted in connection with the hearings on the motions for preliminary injunction and receiver.

I was quite concerned in July, however, regarding the accuracy and completeness of the disclosures and the verification of the evaluation of assets and liabilities disclosed. In response to that concern, the parties have developed an agreement which will result in the accounting firm of Laventhol & Horwath certifying in some form the financial statements of the Schleichers and First Commodity. That information will be available to the plaintiffs, to the Court, and to the customers who are members of the classes conditionally established today. In addition, the Court is authorized to question the Schleichers under oath regarding the accuracy and the completeness of their disclosures to the accountants concerning their assets and transfers in material amounts since 1983.

Thus, there is adequate evidence for present purposes, and the hope of adequate evidence for later purposes, to permit an informed decision with regard to the required factual finding concerning the limited fund.

In addition, there is evidence presented suggesting that there is a risk of judgments which would deplete any limited fund of the dimensions being discussed in this case.

In the *Hocker* case against First Commodity, the jury awarded $3,000,000 in punitive damages.[21] I understand that case was later settled for something less than that. In the *Wegerer* case, compensatory and punitive damages were about $260,-000.[22] In the *Kerr* case, the plaintiff ob-

**18.** *In re "Agent Orange"*, 100 F.R.D. 718 (E.D.N.Y.1983).

**19.** *Id.* at 724-25.

**20.** *In re Northern District of California Dalkon Shield I.U.D. Products Liability Litigation*, 693 F.2d 847 (9th Cir.1982).

**21.** *Hocker v. First Commodity Corp. of Boston*, No. A. C85-130 (D.Wyo.1985).

**22.** *Wegerer v. First Commodity Corp. of Boston*,

tained a $350,000 award.[23]

In addition, if this settlement does not proceed, the MidAm Exchange may attempt to reimpose and collect a $3.5 million fine from First Commodity. In addition, the CFTC's administrative proceedings are continuing. They could result in fines of First Commodity in the millions of dollars. Those fines, if imposed, would go the Federal Treasury. The CFTC has refused requests from the defendants and the plaintiffs to direct any fines to the customers of FCCB in the context of this settlement. To a certain extent, the government and the customers may now be in competition for limited funds.

Thus, for present purposes I'm satisfied that the requirements of Rule 23(b)(1)(B) are properly implicated. I do, however, want the customers and their counsel, if they have counsel, to consider whether the requested mandatory class should be finally certified and advise the Court, particularly if they have an objection.

The proposed settlement also contemplates conditional certification of a Rule 23(b)(3) opt-out class for actual damage claims against First Commodity and its salespeople. I have considered all of the factors described in Rule 23(b)(3).

For reasons I described earlier, I am for present purposes satisfied that there are sufficient common questions to make the issue of whether they predominate in this matter an issue that can be compromised by the parties and settled. Those who dispute the settlement of that issue can opt out or object.

In addition, I have considered whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. This issue is complicated by the existence of the reparation and arbitration vehicles for resolving claims for out-of-pocket costs. Arguably, those reparation and arbitration proceedings are superior to class treatment in the context of this case. Once again, however,

if there is a customer who considers that a reparation or arbitration proceeding is superior in his case, he may opt out and pursue that proceeding with a view to recovering actual damages, the only remedy available in arbitration and reparation proceedings.

For all of those reasons I find that the allegations and, more importantly, the evidence to be adequate for the Court to conditionally certify for settlement purposes the two classes described in the proposed settlement. It is my definite intention to review the propriety of class certification at the fairness hearing. It is my intention to decertify these proposed classes if I am persuaded that either or both of the classes proposed are inappropriate; that is, the notice should indicate to members of classes conditionally certified are invited to comment on the propriety of the class treatment as well as the fairness of the proposed settlement.

Finally for today, I'm satisfied that there is adequate evidence to indicate that the proposed settlement is within the range of reason and merits customer consideration as a possible fair, reasonable, and adequate settlement of their claims as a class. As Judge Friendly pointed out in *Weinberger*, settlements are favored.[24]

In this case, as I said earlier, there has been a significant amount of discovery available from MidAm and the CFTC. This allows plaintiffs' counsel and the Court to proceed on an unusually informed basis.

In addition, the process of negotiations had integrity. I discern no evidence of collusion between plaintiffs' counsel and defendants' counsel. The issue of attorneys' fees apparently was not discussed among them. It will be resolved by the Court in connection with considering approval of the proposed settlement. The negotiations concerning the settlement were generally supervised by the Court. Plaintiffs were represented by capable counsel. The negotiations were arduous.

744 F.2d 719 (10th Cir.1984).

**23.** *Kerr v. First Commodity Corp. of Boston,* 735 F.2d 281 (8th Cir.1984).

**24.** *Weinberger,* 698 F.2d at 73.

The negotiations were protracted. The Court expressed reservations about two prior proposed settlements, which prompted renegotiations resulting in more favorable terms to the plaintiff class.

In addition, there is adequate evidence that the proposed settlement is substantively fair to justify consideration by the proposed class. The proposed settlement covers all customers, and treats all customers equally; there is no special benefit for the class representatives. The major defendants and the major customer claims are addressed by the settlement.

The settlement has the virtue of obtaining money from the Schleichers. In this case, it appears that most of the strongest arguments of the plaintiff class would be against First Commodity, and it might be harder to prove the individual liability of the Schleichers, who are officers and shareholders of First Commodity. I did, however, indicate in my view that plaintiffs had a reasonably strong claim to require the Schleichers to pay back about $4.6 million that they took out of First Commodity in October 1986. That is about what they are paying back in settlement. Whether plaintiffs could have ultimately recovered that money, however, is a distinct issue.

The proposed settlement, if finally approved, will save costly and extensive litigation. It will limit attorneys' fees. It will eliminate uncertainty concerning whether any or all of the plaintiffs would prevail if the class action issues were litigated and whether they would prevail on the merits.

As I alluded to earlier, the defendants do have foreseeable defenses to many, if not all, of the plaintiffs' claims. The merits of those defenses would have to be determined at trial, as would the merit of the claims.

This settlement will allow people who wish to seek to recover actual damages to pursue them in reparation and arbitration proceedings. There has been wide disclosure to people who have shown interest in this, that is, people who filed lawsuits or reparation and arbitration proceedings. Many of those with reparation and arbitration proceedings filed objections to the requested stay. I denied that stay, which I expect meets their objections. Far fewer objections were filed with regard to the merits of the settlement.

I recognize that there is a disturbing imperfection in this proposed settlement in its present posture. It is not possible to suggest what percentage of its losses the class will recover, or any customer will recover. That depends on the number of claims and the amounts of the claims. It seems likely to me that members of the class will only receive repayment of a very small fraction of their losses. This has caused me concern. This, however, will probably be a problem that would exist, and maybe even be enlarged, at the end of successful litigation of either numerous individual actions or of a class action. The same uncertainty regarding the number of claimants and the amount of their cognizable claims could exist at the end of successful class litigation. At that point, it is foreseeable that there would be less money possessed by First Commodity and the Schleichers to satisfy those claims.

As I've said earlier, people can opt out now and pursue actual damages in reparations and arbitration. If the settlement is finally approved, it would extinguish their right to recover multiple or punitive damages. Multiple and punitive damages, however, are intended to serve certain public purposes. They are not intended to unjustly enrich those fortunate few who get to the courthouse most quickly at the expense of other plaintiffs with meritorious claims.

Based on the foregoing, I'm satisfied that the two classes described should be conditionally certified for settlement purposes only. An appropriate notice describing this settlement and inviting objections to class treatment generally, and the fairness of the proposed settlement particularly, will be sent. We will have a fairness hearing at which I will give fresh consideration to all of the issues.

As discussed at the outset, the forms of the orders, form of the notice, and a realistic schedule are matters that should be discussed further by counsel and the Court.