Gerald COHN and Martin Cohn, as Trustee on behalf of the Gerald L. Cohn Trust, for themselves and all others similarly situated, Plaintiffs,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, as surviving company pursuant to the merger between itself and Connecticut Mutual Life Insurance Company, Defendants.

Iris Towers, for herself and all others similarly situated, Plaintiff,

v.

Massachusetts Mutual Life Insurance Company, as surviving company pursuant to the merger between itself and Connecticut Mutual Life Insurance Company, Defendants.

Nos. 3:96CV1257 (RNC), 3:97CV1614 (RNC).

United States District Court, D. Connecticut.

Aug. 27, 1999.

210

J. Daniel Sagarin, Elias A. Alexiades, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, Sherrie R. Savett, Stuart J. Guber, Berger & Montague, Philadelphia, PA, for plaintiff Gerald Cohn.

Lester L. Levy, Francine B. Goodman, Emily Madoff, Wolf Popper, New York City, J. Daniel Sagarin, Elias A. Alexiades, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, for plaintiff Iris Towers.

Stanford N. Goldman, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Vaughn C. Williams, Stanley A. Chinitz, Skadden, Arps, Slate, Meagher & Flom, New York City, Thomas J. Groark, Jr., Mitchell R. Harris, Kevin J. O'Connor, Peter M. Holland, Day, Berry & Howard, Hartford, CT, for defendant Massachusetts Mutual Life Insurance Co. and Connecticut Mutual Life Insurance Co.

### RULING ON MOTION FOR CLASS CERTIFICATION

CHATIGNY, District Judge.

Plaintiffs Gerald Cohn, Martin Cohn, and Iris Towers seek relief for alleged misrepresentations made by defendant Connecticut Mutual Life Insurance Company in connection with the sale of whole life insurance policies.[1] The plaintiffs purport to act on their own behalf and on behalf of a class of similarly situated persons. Pending before the court is the Cohns' motion for class certification (doc. # 51). For reasons explained below, the motion is denied.

### I. BACKGROUND

Plaintiffs Gerald Cohn ("Cohn") and Iris Towers ("Towers") allege that they were in-

---

**1.** Since the transactions at issue in this case, Connecticut Mutual has merged with defendant Massachusetts Mutual Life Insurance Company. Massachusetts Mutual is the entity that survived the merger.

duced to buy "participating," or dividend-paying, whole life insurance policies on the basis of misleading sales presentations and marketing materials presented to them by agents for Connecticut Mutual.[2] The sales presentations and marketing materials—which consisted primarily of written "illustrations" or schedules that projected annual premiums and other values associated with the policies—allegedly misrepresented that future premiums would "vanish" after an initial series of annual payments, as dividends and interest credited to the policies accumulated sufficiently to cover the cost of future annual premiums. Plaintiffs claim they were not informed of the following material facts: that premium might not vanish at the time specified in the illustrations; that the date the premiums would vanish would depend on the dividend scale declared annually by Connecticut Mutual's board of directors; and that the board's annual determinations would be influenced by numerous variables subject to fluctuation, such as investment performance, interest rates and mortality rates.

Plaintiffs allege that on or after the date when their premiums were supposed to vanish, they were informed that they would have to make additional payments of premiums to keep their policies in force. Cohn alleges that he has undertaken to make additional payments on his policy. He states that he now expects to pay approximately $60,000 more that he originally believed would be necessary to become free of further out-of-pocket payments. Towers alleges that she has refused to pay additional premiums and that Connecticut Mutual has deducted the amounts due from the built-up cash value of her policy.

The Cohns assert claims for breach of contract, negligence, fraud, negligent misrepresentation, imposition of a constructive trust on the basis of alleged unjust enrichment, and violation of Connecticut's Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42–110a et seq.[3] Tower's complaint asserts substantially the same claims.[4] The plaintiffs seek damages, attorneys' fees and costs, and an order imposing a constructive trust on Massachusetts Mutual, the successor in interest to Connecticut Mutual.

Pursuant to Fed.R.Civ.P. 23(b)(3), the Cohns seek certification of a class consisting of:

> All persons (the "Class") who, from and after January 1, 1984, purchased life insurance policies, solicited, underwritten and sold by [Connecticut Mutual], based upon [Connecticut Mutual]'s uniform sales presentations and illustrations, utilizing the "vanishing premium" concept. Excluded from the Class are the defendants herein, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

The Cohns claim that this class consists of "at least a sizable portion" of the 350,000 individuals who purchased participating whole life policies from Connecticut Mutual between 1984 and its merger with Massachusetts Mutual in 1996.[5]

## II. DISCUSSION

■ Before certifying a class pursuant to Fed.R.Civ.P. 23(b)(3) the court must determine:

> [1] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action

---

**2.** According to the complaint, Martin Cohn is trustee of the Gerald Cohn Trust. The insurance policy purchased by Gerald Cohn that is the subject of this action is part of the corpus of that trust.

**3.** Cohn initially asserted claims for breach of fiduciary duty and violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"), C.G.S. § 38a–815 et seq., as well. On September 26, 1997, the court granted the defendants' motion to dismiss those two counts.

**4.** Towers, whose case was consolidated with the Cohn case on September 22, 1998, asserts claims for breach of contract, fraud, fraudulent concealment, negligent misrepresentation, breach of fiduciary duty, breach of the covenant of good faith and fair dealings, unjust enrichment, and violations of CUIPA and CUTPA.

**5.** Cohns' Reply Memorandum dated April 3, 1998, p. 20; see also Affidavit of Charles H. Gray, Jr., dated January 9, 1998.

is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). "These requirements ensure that certification is granted only where the adjudication of common issues in a single action will achieve judicial economies and practical advantages without jeopardizing procedural fairness. *Amchem [Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997) ]; *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1084 (6th Cir.1996); 1 *Newberg*, § 4.24; 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1777 (1986)." *Rothwell v. Chubb Life Ins. Co. of America*, Civ. No. 96–83–B, slip op. at 11 (D.N.H. March 31, 1998).

▮▮▮▮ The court has broad discretion in deciding whether to certify a class. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Lundquist v. Security Pacific Automotive Financial Services Corp.*, 993 F.2d 11, 14 (2d Cir.1993). However, "that discretion must be exercised within the framework of Rule 23." *American Medical Systems*, 75 F.3d at 1079 (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)). Though the court may not evaluate the merits of the movants' substantive claims at this stage, *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the court must perform a "rigorous analysis" to ensure that the requirements of Rule 23 have been met. *See General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (internal quotation marks omitted), the Rule 23 analysis often requires the court "to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364; *see also Castano v. American Tobacco Company*, 84 F.3d 734, 744 (5th Cir.1996). The court's decision whether to certify a class should be based on "a pragmatic assessment of the entire action." *In re Jackson National Life Ins. Co. Premium Litigation*, 183 F.R.D. 217, 221 (W.D.Mich. 1998) (citing 5 *Moore's Federal Practice*, 3d ed., § 23.46[1] ). The movant bears the burden of proving that certification is warranted. *See Falcon*, 457 U.S. at 160–61, 102 S.Ct. 2364, *Caridad v. Metro–North Commuter Railroad*, 191 F.3d 283, 290–91 (2d Cir.1999).

The defendants argue that the proposed class should not be certified because neither prong of Rule 23(b)(3) is satisfied. The court agrees.[6]

### A. *Predominance*

The Cohns argue that the predominance requirement is satisfied by the facts and legal issues concerning Connecticut Mutual's alleged scheme to deceptively market participating whole life insurance using the "vanishing premium" concept. They assert that the written illustrations produced by Connecticut Mutual and distributed to the company's network of agents, or printed by the agents themselves using software provided by the company, were identical in all material respects in each of the transactions at issue. Similarly, they contend, as a result of Connecticut Mutual's centralized training program, the sales presentations used by the sales people in each transaction were uniformly misleading. The evidence concerning these allegedly uniform illustrations and sales presentations, the underlying training programs, and the state of mind of Connecticut Mutual in orchestrating the alleged scheme, and the legal determinations that will be based on this body of evidence, are said to constitute the core of the controversy regarding each class member. Accordingly,

---

6. The defendants also argue that certification should not be granted because the Cohns' claims are not typical of those of the class; the Cohns have not established that they would adequately represent the class; the proposed class provides an inadequate basis for identifying class members; and some members of the proposed class lack standing, have claims that are not ripe or fail to meet the amount in controversy. Because the court concludes that individual questions predominate and a class action is not the superior method of adjudicating the controversy, it is unnecessary to address these other issues.

the Cohns assert, the predominance requirement is satisfied.

The defendants deny that the sales presentations and the illustrations were uniform. The lack of uniformity in the thousands of face-to-face transactions at issue ensures the predominance of individual issues, the defendants claim. After careful consideration of the materials submitted in regard to the class certification motion, the court agrees with defendants.[7]

██ The defendants have demonstrated that the sales illustrations distributed by Connecticut Mutual to its sales force, or printed by the salespeople using software provided by the company, varied in many significant respects during the thirteen year period at issue. The differences included many changes in the language and format of disclosures concerning the variability of dividends and interest rates, and the effect of this variability on the size or schedule of out-of-pocket premiums. For example, in 1985 the disclosures accompanying the illustrations included the following statements:

Base policy premiums are payable for life.

\*    \*    \*    \*    \*    \*

Dividends, any interest on accumulations, and one year term cost are based on the 1985 dividend scale and are neither guarantees nor estimates for the future.

Dividends reflect current investment, mortality, expense and federal income tax experience of the company.[8]

The 1987 disclosures substituted the following statements:

Base policy premiums are payable for life.

\*    \*    \*    \*    \*    \*

Dividends, any interest on accumulations, and one year term cost are based on the 1987 dividend scale, are not guaranteed

and are based on a vote by our board of directors. Among the factors they consider in approving a dividend scale are our investments and other earnings, expenses we incurred, federal income tax experience of the company, earnings transferred to surplus and mortality or morbidity experience, all of which are subject to change over time. Dividends will be affected by any outstanding loan and loan interest charged during the policy year.

\*    \*    \*    \*  .  \*    \*

In years 1 through [x] total premiums are paid with out-of-pocket funds. At the beginning of year [x + 1], all or a portion of the total premium is paid by surrendering a portion of the dividend accumulations, paid-up additions and additional benefit option (ABR–86) cash values, in that order, to the extent necessary. Since dividends are not guaranteed, the amount you may have to pay can vary. . . . [9]

Illustrations printed in 1992 were accompanied by disclosures stating:

Base policy premiums are PAYABLE FOR LIFE.

\*    \*    \*    \*    \*    \*

Any dividends, interest on accumulations and one year term costs are based on the 1992 Dividend Scale. These policy elements are not guaranteed and are not estimates of amounts to be paid in the future. Values shown will go up or down when the Dividend Scale changes. Also dividends will be affected by the amount of any outstanding loan.[10]

And in 1993, a new disclosure was adopted which stated:

---

7. The defendants also forcefully argue that pursuant to Connecticut's choice of laws rules, each transaction is governed by the law of the state in which it occurred. They claim that the need to apply the law of fifty different jurisdictions magnifies the predominance of individual questions. There is no need to resolve this choice of law issue because even if Connecticut law applies to the claims of all members of the proposed class, class certification would still be inappropriate under Rule 23.

8. Exhibit A attached to Affidavit of Theodore E. Affleck dated June 2, 1998.

9. Exhibit B attached to Affidavit of Theodore E. Affleck dated June 2, 1998.

10. Exhibit C attached to Affidavit of Theodore E. Affleck dated June 2, 1998.

This ledger is not part of any policy and does not modify the terms and values of any policy.

\* \* \* \* \* \*

Base policy premiums are payable for life.

\* \* \* \* \* \*

Any dividends are based on the 1993 dividend scale and are neither guaranteed nor estimates of amounts to be paid in the future. Values shown will go up or down when the dividend scale changes. The dividend scale is approved each year by our Board of Directors.

\* \* \* \* \* \*

This 10 page proposal is not a contract. Please review all pages and refer to your policy for a complete explanation of your benefits.

\* \* \* \* \* \*

### MODIFIED PAYMENT OPTION

This is an option whereby future premium payments can be made by surrendering a portion of your existing and future policy values. This proposal assumes that payments will be made in full by you for years 1 through [x], and that beginning in year [x + 1], all or a portion of future total premiums would be paid by surrendering a portion of any accumulated dividends, paid-up additional insurance and/or cash value in that order to the extent necessary. Since dividends are not guaranteed, the amount you may have to pay can vary.[11]

Moreover, during much of the period between 1984 and 1996, the agents had the ability to individualize the illustrations by altering certain factors used in the underlying calculations. Their ability to make such alterations varied with changes in the capabilities of the company-provided software during the period. At certain times they had the ability to print illustrations showing comparative schedules based on differing assumptions regarding future dividend scales.[12]

Defendants have adduced an example of this type of comparative illustration. It contains both a schedule based on the last dividend scale adopted by the board of directors (the typical basis for illustrations), and a comparative schedule based on a lower, hypothetical dividend scale. The second schedule clearly projects a later vanishing point than the schedule based on the last dividend scale.[13]

The defendants have also shown that the tens of thousands of agents and brokers authorized to sell Connecticut Mutual's life insurance policies during the proposed class period—many of whom were licensed to sell products of other insurance companies[14]—were not subject to a uniform training program. According to the uncontradicted statements of Connecticut Mutual's former "Competitive Support Officer," although Connecticut Mutual made training material available to its agents, "[a]gent training varied by general agency.... Each general agent had primary responsibility for training his or her own agents.... [T]he general agents did not act in concert with one another and were not under the control of Connecticut Mutual."[15] Moreover, "training varied over the ... class period ... as tax laws and economic conditions changed ..., new products became available ..., [and] technological advances and changes in insurance regulations resulted in changes to the format and content of sales illustrations."[16]

The evidence also indicates that sales presentations concerning the insurance products at issue might well have varied in significant respects from transaction to transaction.

---

**11.** Exhibit D attached to Affidavit of Theodore E. Affleck dated June 2, 1998.

**12.** *See* Affidavit of Theodore E. Affleck dated June 2, 1998, p. 4.

**13.** *See, e.g.,* Cohns' Reply Memorandum dated April 3, 1998, Exhibit H, Bates No. CMC 00009906–15.

The Cohns argue that variations in the content of illustrations are immaterial and, therefore, should not impact the predominance analysis. However, the court is not persuaded that such variations are irrelevant as a matter of law.

**14.** *See* Affidavit of Charles H. Gray, Jr. dated January 9, 1998.

**15.** Affidavit of Theodore E. Affleck dated June 2, 1998, p. 8.

**16.** *Id.* at 9.

The presentation of any given salesperson was potentially subject to variation in material respects depending on the circumstances of the transaction, including the nature of the questions asked by the purchaser, the purchaser's relationship with the salesperson, and the salesperson's perception of the purchaser's needs, objectives, and financial sophistication.[17] The Cohns have failed to demonstrate that all salespeople responded to these multiple variables in essentially the same fashion. Common sense dictates that they did not, particularly given the absence of a uniform training program. In addition, it is undisputed that sales illustrations were not always used.[18] When used, their content could vary in the ways described above, and the explanations that accompanied them could vary widely, depending, again, on the questions asked by the purchaser, the practice of the salesperson and numerous other factors.[19]

■ "[D]etermination of whether and which illustrations were given to class members, and of the nature of oral representations made to them at the point of sale, [are] elements of obvious and undeniable importance" to the claims of each class member. *Jackson National,* 183 F.R.D. at 221. Fact development concerning these matters will be essential to litigation of the claim in count one (breach of contract) that, notwithstanding the contrary terms of the written policy, Connecticut Mutual "promised and agreed that the single prepayment of premiums at the time of purchase of the policies, or the payment of premiums during the initial years of the policies, would be sufficient to pay-up the policies for the life of the insured without reducing the death benefit of the policies";[20] the claim in count three (negligence) that, as a result of Connecticut Mutual's poor supervision of its agents' selling of "vanishing premium policies," the agents failed to "fully disclose[ ] all material facts and ... misrepresent[ed] or omit[ted] such facts in conducting such sales";[21] the claims in counts four and five (fraud and negligent misrepresentation, respectively) that Connecticut Mutual falsely "stated and represented to the plaintiffs and the members of the Class that the single prepayment of premiums at the time of purchase of the policies, or the payment of premiums only during the initial years of the policies would be sufficient to pay-up the policies for the life of the insured without reducing the death benefit of the policies";[22] and the claim in count six (unjust enrichment and imposition of a constructive trust) that Connecticut Mutual "promised that payment of premiums by the plaintiffs and members of the Class would no longer be required or necessary" after an initial payment or relatively brief series of payments.[23] The need for individualized fact-finding on these essential issues "militates against a finding that ... common questions" predominate. *Jackson National,* 183 F.R.D. at 221.

■ The conclusion that individual questions predominate is bolstered by consideration of the issue of reliance. Assuming without deciding that there were material misrepresentations in any given transaction, under Connecticut law—which plaintiffs insist is applicable to the claims of all class

---

17. *See* Affidavit of John C. Adams, III, pp. 2–3; Affidavit of Theodore E. Affleck dated June 2, 1998, pp. 8–9.

18. *See* Affidavit of John C. Adams, III, pp. 2–3; Affidavit of Theodore E. Affleck dated June 2, 1998, pp. 8–9.

19. *See* Affidavit of John C. Adams, III, pp. 2–3.

20. First Amended Complaint, ¶ 21.

21. First Amended Complaint, ¶ 31.

22. First Amended Complaint, ¶¶ 35, 42. Moreover, to prevail on their fraud and negligent misrepresentation claims under Connecticut law, plaintiffs must prove that Connecticut Mutual's representations were offered as a matter of fact and not opinion. *See e.g., Crowther v. Guidone,* 183 Conn. 464, 467–68, 441 A.2d 11 (1981) ("our cases have consistently required that, as one element of fraudulent misrepresentation, .... under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion"); *Yurevich v. Sikorsky Aircraft Division, United Technologies Corp.,* 51 F.Supp.2d 144, 152 (D.Conn.1999) (plaintiff must show that statement forming basis of negligent misrepresentation claim was offered as statement of fact as distinguished from one of opinion).

23. First Amended Complaint, ¶ 49.

members—plaintiffs must prove justifiable and detrimental reliance on those misrepresentations to prevail on their claims of fraud and negligent misrepresentation. *See e.g., Maturo v. Gerard,* 196 Conn. 584, 589, 494 A.2d 1199 (1985); *Foy v. Pratt & Whitney Group,* 127 F.3d 229, 233 (2d Cir.1997) (citing *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575, 657 A.2d 212 (1995)). Moreover, proof of fraud, with its requirement of justifiable reliance, is also likely to be necessary for the plaintiffs to prevail on the contract claim in the face of the parol evidence rule.[24] *See TIE Communications, Inc. v. Kopp,* 218 Conn. 281, 288–89, 589 A.2d 329 (1991).

Justifiable reliance "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Restatement (Second) of Torts* (1976), § 545A, Comment · b. Accordingly, given the inevitable differences in the knowledge and financial sophistication of the members of the proposed class and the degree of care they exercised in reviewing the documentation presented to them in the course of their purchases, and given that the misrepresentations, if any, necessarily varied to some extent from transaction to transaction, determining whether there was justifiable reliance in any given case will require extensive individualized adjudication.[25] As noted by the Supreme Court, when it is necessary to obtain "proof of individualized reliance from each member of the proposed plaintiff class" in this fashion, it is impossible to proceed with adjudication in the form of a class action, "since individual questions then would ... overwhelm[ ] the common ones." *Basic, Inc. v. Levinson,* 485 U.S. 224, 242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (upholding certification of plaintiffs' class in securities fraud action where reliance could appropriately be presumed on a "fraud-on-the-market" theory). *See, e.g., In re The Hartford Sales Practices Litigation,* Civ. No. 97–MD–1204, 1999 U.S.Dist. LEXIS 10402, *44–*50 (D.Minn. June 10, 1999) (denying class certification in a vanishing premium case in light of the necessity of individualized determinations on the reliance issue); *Jackson National,* 183 F.R.D. at 221–22 (same); *Rothwell v. Chubb Life Insurance Co. of America,* Civ. No. 96–83–B, slip op. at 16–17 (D.N.H. March 31, 1998) (same); *Peoples v. American Fidelity Life Ins. Co.,* 176 F.R.D. 637, 645 (N.D.Fla.1998) (same).

The Cohns contend that individualized fact finding is not necessary because reliance can be presumed. However, they have cited no case, and none has been found, suggesting that Connecticut law permits a presumption of reliance in common law fraud or negligent misrepresentation cases under any circumstances.[26] Moreover, the cases cited by the Cohns in which courts have presumed reliance, and on that basis certified a plaintiffs' class in a fraud or misrepresentation action, are distinguishable insofar as they involved essentially uniform misrepresentations directed at all members of the class. *See, e.g., In re The Prudential Ins. Co. of America,* 962 F.Supp. 450, 513–516 (D.N.J.1997) (misrepresentations made by agents selling "vanishing premium" policies were "virtually identical" because of uniform training and the use of uniform sales materials); *see also Cope v. Metropolitan Life Ins. Co.,* 82 Ohio St.3d 426, 433 & 433 n. 3, 696 N.E.2d 1001 (1998) (Plaintiffs' claims were "not based on any oral or affirmative misrepresentation or any other actionable conduct occurring during preapplication sales negotiations .... [but, rather, on allegations that MetLife] intentionally omit[ted] the state-

---

**24.** *See* Cohns' Reply Memorandum dated April 3, 1998, Exhibit I, p. 6 (whole life policy's stating: "The policy and the application constitute the entire contract. A copy of the application is attached to and made a part of this policy.... Our agents cannot alter or modify any of the terms of this policy. They cannot waive any of its provisions.")

**25.** In addition, determination of issues of contributory negligence and causation, in connection with the negligence and CUTPA claims, will involve individualized fact development similar to that required by the reliance inquiry. *See,* C.G.S. § 42–110g(a) (private action may be brought under CUTPA by any person who suffers loss "as a result of" an unfair trade practice).

**26.** Indeed, the overwhelming majority of states do not permit a presumption of reliance in common law fraud cases. *See In re Ford Motor Co. Vehicle Paint Litigation,* 182 F.R.D. 214, 221–22 (E.D.La.1998).

mandated written disclosure warnings...." The claims were "to be decided strictly upon the standard written policy contracts, not upon any oral misrepresentations of MetLife or its agents.") "Where, as here," the content of the illustrations varied, and "the information contained in the illustrations was shared with consumers, if at all, in the context of varying oral presentations, presumption of reliance is inappropriate." *Jackson National,* 183 F.R.D. at 222.[27]

The Cohns rely heavily on a collection of roughly sixty complaint letters from Connecticut Mutual whole life insurance policyholders.[28] They contend that the letters demonstrate a uniform practice on the part of Connecticut Mutual of misrepresenting that premiums would no longer be due after a certain, definite time. The letters do not provide an adequate basis for concluding that all or even most members of the proposed class experienced comparable misconduct.[29] Nor do they demonstrate that the transactions at issue were the same in all material respects. Indeed, the letters hint at material differences in the facts of each individual sale, including variations in the nature of the sales presentations; the purchaser's sophistication and level of understanding; and the purchaser's conduct in reading (or not reading) the terms of the policy, any written illustration that may have been presented, and any disclosures that might have accompanied any illustrations.[30]

The Cohns also rely heavily on the transcript of a Connecticut Mutual training video that discouraged agents from disclosing the possibility that dividend rates could decline in the future.[31] This evidence casts Connecticut Mutual in an unfavorable light. However, it does not provide a basis for finding that all the agents saw the video and then made uniformly deceptive sales presentations. It is undisputed that all the agents were not trained the same way. Moreover, other training materials admonished agents not to guarantee any particular illustration,[32] and encouraged them to use comparative illustrations like the one described above, which strongly suggested that dividends could decline and the vanishing point could change.[33]

Finally, the Cohns suggest that pursuant to Rule 23(c)(4), issues requiring individualized determinations could be severed

**27.** In any event, even if were appropriate to presume reliance on any actionable misrepresentations, the · predominance requirement would not be satisfied because it would still be necessary to conduct extensive individualized adjudication to determine whether any such representations were made to each member of the proposed class. *See* 28 U.S.C.A. Rule 23, Notes of the Advisory Committee on Rules, 1966 Amendment (noting that even where the allegations of the proposed class of fraud claimants "hav[e] a common core, ... if there was a material variation in the representations made or in the kinds or degree of reliance by the persons to whom they were addressed," class treatment is inappropriate); *see also* 7B Wright, Miller & Kane, *Federal Practice and Procedure* § 1782 (1986) ("if the action was based on consumer fraud and defendant was alleged to have perpetrated the fraud by means of oral misrepresentations, the common questions probably would not be found to predominate").

**28.** *See* Cohns' Reply Brief dated April 3, 1998, Exhibit E.

**29.** The Cohns have offered no statistical evidence suggesting that the complaints expressed in the collection of letters accurately reflect the transactions of "[a]ll persons ... who, from and after January 1, 1984, purchased [Connecticut Mutual] life insurance policies ... based upon ... sales presentations and illustrations, utilizing the 'vanishing premium' concept." Cohns' Motion for Class Certification dated October 31, 1997. *Cf. Caridad v. Metro–North Commuter Railroad,* 191 F.3d 283, 292–94 (2d Cir.1999) (statistical evidence presented by Title VII plaintiffs, which showed statistically significant disparities in employer's treatment of African–American employees, satisfied commonality requirement of Rule 23(a)).

**30.** *See* Defendants' Surreply Memorandum dated June 3, 1998, pp. 19–22, 59–61.

**31.** *See* Cohns' Reply Memorandum dated April 3, 1998, Exhibit D, Bates No. CMC 00000066–67.

**32.** *See* Exhibit F attached to Affidavit of Theodore E. Affleck dated June 2, 1998 ("Computer illustrations of current dividends into the future, whether by Connecticut Mutual or by any other company, are not guaranteed. They reflect distribution of a share of the company's earnings as they are experienced. Hence, they cannot be guaranteed, nor should they be.").

**33.** *See* Cohns' Reply Memorandum dated April 3, 1998, Exhibit D, Bates No. CMC 00000274–275; *id.,* Exhibit H, Bates No. CMC 00009906–15.

218

from the common questions, ensuring that common questions would predominate in the class trial.[34] However, as the Fifth Circuit has noted:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.... Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

*Castano*, 84 F.3d at 745 n. 21.

Considering the cause of action as a whole, the predominance requirement is not satisfied. Though there are issues common to the members of the proposed class, including in particular the actions and state of mind of Connecticut Mutual in pursuing the vanishing premium marketing strategy, these common questions are overshadowed by individualized issues such as the nature of the oral representations or disclosures made by the agent or broker at the point of sale, the nature of any questions asked by the consumer, the content of any written illustrations or disclosures given to the consumer, the degree of care exercised by the consumer in reviewing any written illustrations and the policy instrument, the portions of the offer that were attractive to the consumer, the degree of the consumer's financial sophistication and his or her understanding of the product. These individualized issues, which are essential to the determination of the claims of each class member, predominate over questions common to the class.

**34.** *See* the Cohns' Memorandum dated October 31, 1997, pp. 26–27.

**35.** The defendants also argue that a class action would not be a superior form of adjudication because the case presents immature or novel theories and because, based on the outcomes of

**B. Superiority**

■ The Cohns contend that a class action would be "superior to other available methods for the fair and efficient adjudication of the controversy," Fed.R.Civ.P. 23(b)(3), because judicial resources would be squandered by trials of thousands of similar claims against Connecticut Mutual in courts across the country and, somewhat inconsistently, because few class members will pursue their claims individually due to the expense of the litigation and the small amount of money likely to be at stake in any one case. The defendants counter that the superiority requirement cannot be satisfied because the predominance of individual issues would render a class action unmanageable. Here, again, the court agrees with the defendants.[35]

As noted in *Peoples,* 176 F.R.D. at 645, where the court declined to certify a plaintiffs' class in a case substantially similar to this one:

> If common issues of fact predominate, there is some reasonable expectation that the ultimate trial of the case will be manageable. The contrary is also true. If each purchase of a policy has to be examined as to the content of the presentation, the questions asked by the purchaser, the parts of the offer which were attractive to the purchaser, and the reliance by the purchaser on both the oral and written presentations, there will have to be a mini-trial involving each of those issues for each of the thousands of purchasers plaintiffs purport to represent.

*Id.* In light of the individualized proof that would be necessary to properly adjudicate the claims of each of the thousands of members of the proposed class, a class action trial of all issues would not be feasible. *See id.; The Hartford,* 1999 U.S.Dist. LEXIS 10402 at *48; *see also Castano,* 84 F.3d at 745 n. 19

comparable cases, the plaintiffs' claims are likely to be unsuccessful. Because the court concludes on other grounds that a class action would not be a superior method of adjudication, it is unnecessary to address these arguments.

("[t]he greater the number of individual issues, the less likely superiority can be established").[36]

▮ Moreover, any attempt to make the case manageable by bifurcating issues—adjudicating the common issues first in a class trial, and then the individual issues in separate trials, as the Cohns suggest—would run the risk of causing a second jury to reconsider matters previously tried by the first jury. For instance, the issue of comparative negligence undoubtedly would require individualized treatment in the second stage of the litigation. However, to determine that issue in any particular case would require consideration of the actions of Connecticut Mutual, which would have been considered by the jury in the first stage. The same may be true for the sufficiency of the defendants' disclosures and numerous other issues.[37] "The net result may be a waste, not a savings, in judicial resources." *Id.*[38] But more fundamentally, such reconsideration of issues by a second jury would violate the Seventh Amendment's guarantee that only one jury will pass on an issue of fact. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 537–38, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir.1999); *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302–03 (7th Cir.1995).

Finally, although the small size of any loss suffered might deter suits by many members of the proposed class, the cost of litigation will not be an insurmountable obstacle to those who wish to pursue claims, given the availability of attorneys' fees under CUTPA and the consumer protection statutes of many other states. *See* C.G.S. § 42–110g(d); *Castano*, 84 F.3d at 748.

In light of these considerations, a class action would not be a superior means of adjudicating the controversies between the members of the proposed class and the defendants.

### C. Conclusion

The Cohns have failed to show that certification of the proposed class is appropriate. Accordingly, their motion for certification of a class is denied. Pursuant to Fed.R.Civ.P. 23(d)(4) & 42(a), the plaintiffs are ordered to file a consolidated complaint setting forth the claims of the named plaintiffs only, and containing no allegations as to representation of absent persons. The amended complaint is due by October 11, 1999.

▮

**36.** The certification of the class in *Prudential,* 962 F.Supp. 450, does not avail the Cohns in regard to the superiority prong because the case:

is distinguishable not only factually—by virtue of the uniformity of alleged misrepresentations, which simplified fact issues ... but also procedurally, inasmuch as the *Prudential* class was certified for settlement purposes only. The Third Circuit observed in affirming the *Prudential* class certification that when a district court is confronted with a request for settlement-only class certification, it "need not inquire whether the case, if tried, would present intractable management problems .... for the proposal is that there be no trial." 148 F.3d [283,] 316 n. 57 [(3d Cir.1998)], quoting *Amchem,* 521 U.S. 591, 117 S.Ct. at 2248. *Jackson National,* 183 F.R.D. at 224.

**37.** The sufficiency of Connecticut Mutual's written disclosures is one of the primary examples of purportedly common issues offered by the Cohns. *See* the Cohns' Reply Memorandum dated April 3, 1998, p. 27. Given the numerous changes in the format and text of the illustrations noted above, it is by no means clear that this aspect of the matter could be properly dealt with in a common proceeding. However, even assuming that it could, in many individual cases the sufficiency of the written disclosures would have to be reconsidered in conjunction with the content of the oral presentation made by the agent in order to determine whether Connecticut Mutual's disclosures were sufficient overall.

**38.** Achieving conservation of judicial resources through a class action seems particularly doubtful given the lack of any factual support for the Cohns' suggestion that thousands of similar suits will clog the court system across the country. Though the plaintiffs represent that some unspecified number of other, comparable suits against the defendants are pending, nothing in the record shows that there has been a flood of suits. "Until plaintiffs decide to file individual claims, a court cannot, from the existence of injury, presume that all or even any plaintiffs will pursue legal remedies. Nor can a court make a superiority determination based on such speculation." *Castano,* 84 F.3d at 748.