Mark MARKARIAN, Plaintiff,

v.

**CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. C.A. 96–10421–MLW.

United States District Court, D. Massachusetts.

Aug. 13, 2001.

David Pastor, Gilman and Paster, LLP, Peter A. Lagorio, Stonehill Corporate Center, Saugus, MA, for Mark Markarian.

LeAnn G. Gaunt, Kenneth M. Lehman, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Vaughn C. Williams, Stanley A. Chinitz, Helen L. Monaco, Skadden, Arps, Slate, Meagher & Flom, New York City, for Connecticut Mutual Life Insurance.

Thomas J. Dougherty, Kenneth M. Lehman, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Massachusetts Mutual Life Insurance Company.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

I. SUMMARY

Plaintiff Mark Markarian ("Markarian") brought this putative class action on behalf of individuals who purchased certain types of life insurance policies from Connecticut Mutual Life Insurance Company ("Connecticut Mutual")[1] between January 1, 1980 and December 31, 1992. Markarian alleges that Connecticut Mutual intentionally engaged in

---

1. Connecticut Mutual merged with Massachu- setts Mutual Insurance Company in 1996.

deceptive sales practices by having agents use a "vanishing premium" sales strategy to sell life insurance policies.

The type of policy at issue in this case has been known both as the "Modified Paid–Up Option" and the "Modified Payment Option," the abbreviation for both of which is "MPO." In a 1981 communication to agents, Connecticut Mutual explained that:

MPO is a permanent insurance illustration that features an alternative way in which a policy may be paid-up through the use of dividend accumulations or dividend additions.

MPO differs from the traditional reduced paid-up method of using dividends to pay up a policy in that the paid-up date occurs so much earlier, and there is no sharp reduction in the death benefit when the policy becomes "paid-up." The MPO approach is to have dividends accumulate at interest[,] or purchase paid-up additions for a sufficient number of years[,] such that annual dividends from then on plus either withdrawals from accumulated dividends or partial surrenders of paid-up additions will, based on the current dividend scale, be sufficient to pay all future premiums.

Connecticut Mutual's board of directors determines its dividend level on an annual basis.

Markarian met with an insurance agent in May, 1987 to discuss different types of life insurance products. The agent made a sales presentation to Markarian that included an Illustration of a Connecticut Mutual MPO policy, which showed the amount and timing of premium payments, the dividends paid during the initial years of the policy, as well as other aspects of the policy. Markarian asserts that the Illustration indicated that if he made seven annual payments—$1,255 each year between 1987 and 1993—and an additional payment of $244 in the eighth year, he would owe no further "net premiums." In other words, at the end of the eight years, the total net premiums would be $0. The document also stated that the amount of dividends shown on the Illustration was not a guarantee or estimate. Markarian, however, may not have read this lan-

guage and purchased a $100,000 whole life insurance policy believing that the premiums would "vanish" after seven years. In May, 1995, two years after the premiums were to have "vanished," Markarian received a premium notice from Connecticut Mutual in the amount of $1,255.

In February, 1996, Markarian filed the instant lawsuit and has asserted claims of fraudulent inducement, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, reckless, wanton, and/or negligent supervision, breach of contract, declaratory and injunctive relief, reformation, violation of Mass. Gen. Laws ch. 93A ("Chapter 93A"), and violation of deceptive trade practices laws. This court has jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367.

Pending before the court is Markarian's motion for class certification. After a hearing, for the reasons set forth below, Markarian's motion for class certification is being denied.

## II. PROCEDURAL HISTORY

Markarian filed his original complaint on February 29, 1996. On April 26, 1996, Connecticut Mutual filed a motion to dismiss, which became moot with the filing of the first amended complaint on July 15, 1996. Connecticut Mutual filed a motion to dismiss the first amended complaint on August 23, 1996. The court denied the motion to dismiss after a hearing, and in its December 15, 1997 order allowed Markarian's motion to amend his complaint to add a claim under Chapter 93A.

Markarian filed a second amended complaint on January 26, 1998, and Connecticut Mutual filed a motion to dismiss that complaint on February 3, 1998. After a hearing, on November 3, 1998 the court denied Connecticut Mutual's motion to dismiss the count alleging fraudulent inducement, and reserved judgment as to the viability of the remaining claims.

## III. REQUEST FOR CLASS CERTIFICATION

In his second amended complaint, Markarian proposed a class that included:

[A]ll persons (the "Class") who, from and after January 1, 1980 (the "Class Period"), purchased life insurance policies underwritten and sold by Connecticut Mutual based upon Connecticut Mutual's policy illustrations using the "premium offset" or "vanishing premium" concept and whose damages exceed the sum of $50,000. This action is also brought on behalf of a Subclass of persons who were residents of the Commonwealth of Massachusetts at the time they purchased their policies (the "Chapter 93A Subclass") and a Subclass of persons who at the time they purchased the policies were residents of states with either (a) an applicable deceptive trade practice statute which prohibits unfair or deceptive practices in the sale of life insurance policies, or (b) an applicable insurance statute which prohibits unfair or deceptive practices in the sale of life insurance policies, and which expressly or by implication provides for a private right of action for violations of the statute (the "Deceptive Practices Subclass").

In his motion for class certification Markarian narrowed the definition to include only:

All persons who, while residents of Massachusetts, purchased any Insurance Policies from Connecticut Mutual between January 1, 1980 and December 31, 1992, and who, according to Connecticut Mutual's records and/or the records of its agents, purchased based on the "Modified Paid-up Option" or "Modified Payment Option" ("MPO") concept and/or who signed and submitted an MPO authorization form at or about the time of purchase.

For the purposes of this definition "Insurance Policies" shall mean the following: Whole Life; Graded Premium Life; Econolife; GPL 20; or Executive Whole Life. Expressly excluded from the class are Defendant, its employees, officers, agents and brokers, to avoid conflict of interest.

(internal footnote omitted).

Connecticut Mutual filed its opposition to the motion for class certification on December 14, 1999. Markarian filed his reply on February 4, 2000, in which he agreed to exclude from the class definition: (1) policyholders whose beneficiaries received the full death benefit; (2) policyholders whose employers provided their policies as part of executive benefit plans; and (3) policyholders who were not shown or given an MPO Illustration at the time of sale. Connecticut Mutual filed a surreply on October 27, 2000.

The court held a hearing on plaintiff's motion on November 9, 2000. At that hearing, Markarian further narrowed his request for class certification, limiting the time period to include claims that arose after January 1, 1987, and limiting the proposed class to include only individuals whose claims arise under Chapter 93A. Thus, the proposed class that the court has considered includes:

All persons who, while residents of Massachusetts, purchased any Insurance Policies from Connecticut Mutual between January 1, 1987 and December 31, 1992, and who, according to Connecticut Mutual's records and/or the records of its agents, purchased based on the "Modified Paid-up Option" or "Modified Payment Option" ("MPO") concept and were shown or given an MPO illustration and/or who signed and submitted an MPO authorization form at or about the time of purchase.

For the purposes of this definition "Insurance Policies" shall mean the following: Whole Life; Graded Premium Life; Econolife; GPL 20; or Executive Whole Life. Expressly excluded from the class are: a) policyholders whose beneficiaries received the full contract death benefit; and b) policyholders who were provided with their policies by an employer as part of executive benefit plans. Also expressly excluded are Defendant, its employees, officers, agents and brokers, to avoid conflict of interest.

## IV. ANALYSIS

### A. *Standard of Review for Class Certification*

Markarian has limited the proposed class to those individuals whose claims arise under Chapter 93A. This proposed limitation, however, does not obviate the need to satisfy the requirements of the Federal Rules of Civil Procedure. *See Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Federal Rule of Civil Procedure 23 is similar to its Massachusetts counterpart, but "[u]nlike Federal Rule 23, the Massachusetts class action rule does not ... provide to members of the class the opportunity to exclude themselves." Reporters' 1973 Notes to Mass. R. Civ. P. 23.

■■■ Plaintiff bears the burden of proving that class certification is appropriate. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Before certifying a class, a federal court must conduct a "rigorous analysis" of the prerequisites of Federal Rule of Civil Procedure 23(a). *See General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A court should not decide the merits of a case at the certification stage. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, "a motion to certify 'generally involves considerations ... enmeshed in the factual and legal issues comprising [a] plaintiff's cause of action.'" *Kent v. SunAmerica Life Ins. Co.,* 190 F.R.D. 271, 276–77 (D.Mass.2000) (internal citation omitted). This is especially true when examining questions of predominance and superiority, which require a "close look" at the difficulties likely to be encountered in the management of a class action. *Amchem Prods.,* 521 U.S. at 614–17, 117 S.Ct. 2231.

There is, however, "a distinction between identifying the issues that the case will present, for purposes of determining whether the requirements of Rule 23 have been met, and deciding those issues on the merits." *Kirby v. Cullinet Software, Inc.,* 116 F.R.D. 303, 307 (D.Mass.1987) (internal quotation marks and citation omitted); *see also M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.,* 100 F.R.D. 468, 471 (D.Mass.1984) ("At this stage of the proceedings, where the issue is class certification, the Court may not intrude into the merits of a case.").

B. *Federal Rule of Civil Procedure 23 ("Rule 23")*

■■■ Markarian has moved for class certification pursuant to Rule 23(b)(2) and Rule 23(b)(3). The primary relief that Markarian is seeking is monetary. Therefore, analysis of the motion for class certification must begin with Rule 23(b)(3).

Rule 23(b)(3) provides that a court may certify a class if:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In addition to establishing that common questions of law or fact predominate, a plaintiff must also satisfy the four requirements of Rule 23(a), which provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

With a few exceptions, discussed below, federal courts that have considered "vanishing premium" cases in reported decisions have uniformly declined to certify a litigation class pursuant to Rule 23(b)(3). *See In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 193 F.R.D. 505 (W.D.Mich.2000); *Adams v. Kansas City Life Ins. Co.,* 192 F.R.D. 274 (W.D.Mo.2000); *Keyes v. Guardian Life Ins. Co. of Am.,* 194 F.R.D. 253 (S.D.Miss.2000); *Kent v. SunAmerica Life Ins. Co.,* 190 F.R.D. 271 (D.Mass.2000); *Cohn v. Massachusetts Mut. Life Ins. Co.,* 189 F.R.D. 209 (D.Conn.1999); *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332 (D.Minn.1999); *Velasquez v. Crown Life Ins. Co.,* No. M–97–064, 1999 WL 33305652, 1999 U.S. Dist. LEXIS 13186 (S.D.Tex.1999); *In re Hartford Sales Practices Litig.,* 192 F.R.D. 592 (D.Minn.1999); *Rothwell v. Chubb Life Ins. Co. of Am.,* 191 F.R.D. 25 (D.N.H.1998); *cf. In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.,* 201 F.R.D. 456 (D. Minn.2001). Many state courts have reached the same conclusion. *See, e.g., Mentis v.*

*Delaware Am. Life Ins. Co.*, No. 98C–12–023WTQ, 2000 WL 973299 (Del.Super.Ct. May 30, 2000); *M.C. Sullivan Inv. Co. Pension Trust v. Jackson Nat'l Life Ins. Co.*, No. 97–548796 CP (Oakland County Cir. Ct. Aug. 13, 1999); *Russo v. Massachusetts Mut. Life Ins. Co.*, 178 Misc.2d 772, 680 N.Y.S.2d 916 (N.Y.Sup.Ct.1998), *rev'd on other grounds sub nom.*, *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (2001); *Solomon v. Massachusetts Mut. Life Ins. Co.*, No. 9602–0025, 2000 WL 33116006 (C.P. of Phila. County Jan. 19, 2000). *But see In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212 (N.D.Tex.2000) (certifying Rule 23(b)(3) class); *In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.*, 183 F.R.D. 33 (D.Mass.1998) (certifying Rule 23(b)(1) class).

The foregoing cases have rejected class treatment for a variety of reasons. Perhaps the most instructive example is *Cohn, supra*, in which the plaintiffs offered evidence and arguments substantially similar to Markarian's.

Plaintiffs in *Cohn* sought to certify a nationwide class pursuant to Rule 23(b)(3) that would include individuals who had purchased "vanishing premium" life insurance policies from January 1, 1984 forward based on Connecticut Mutual's alleged "uniform sales presentations and illustrations." *Id.* at 211. Plaintiffs asserted claims for breach of contract, negligence, fraud, negligent misrepresentation, imposition of a constructive trust on the basis of alleged unjust enrichment, and violation of Connecticut's Unfair Trade Practices Act. *Id.*

After considering the evidence offered in support of plaintiffs' motion for class certification, the court in *Cohn* found that plaintiffs failed to satisfy the predominance requirement of Rule 23(b)(3). *Id.* at 213. The court agreed with Connecticut Mutual that the "lack of uniformity in the thousands of face-to-face transactions at issue ensure[d] the predominance of individual issues." *Id.* at 213. The court also found that the sales illustrations that Connecticut Mutual distributed to agents, or that agents created using its software, "varied in many significant respects during the thirteen year period at

issue ... [including] many changes in the language and format of disclosures concerning the variability of dividends and interest rates, and the effect of this variability on the size or schedule of out-of-pocket premiums." *Id.* at 213.

Indeed, the court found that "the tens of thousands of agents and brokers authorized to sell Connecticut Mutual's life insurance policies during the proposed class period—many of whom were licensed to sell products of other insurance companies—were not subject to a uniform training program." *Id.* at 214. In support of this finding, the court also observed that "[t]he presentation of any given salesperson was potentially subject to variation in material respects depending on the circumstances of the transaction, including the nature of the questions asked by the purchaser, the purchaser's relationship with the salesperson, and the salesperson's perception of the purchaser's needs, objectives, and financial sophistication." *Id.* at 215. Moreover, the court noted that "it is undisputed that sales illustrations were not always used[,]" and when they were used, their content could vary. *Id.*

In an attempt to demonstrate a "uniform practice on the part of Connecticut Mutual of misrepresenting that premiums would no longer be due after a certain, definite time[,]" the plaintiffs in *Cohn* presented complaint letters from Connecticut Mutual policyholders. *Id.* at 217. Rather than support their argument, however, the court found that these letters "hint at material differences in the facts of each individual sale, including variations in the nature of the sales presentations; the purchaser's sophistication and level of understanding; and the purchaser's conduct in reading (or not reading) the terms of the policy, any written illustration that may have been presented, and any disclosures that might have accompanied any illustrations." *Id.* at 217.

The plaintiffs in *Cohn* also presented a transcript of a Connecticut Mutual training video "that discouraged agents from disclosing the possibility that dividend rates could decline in the future." *Id.* at 217. Although this evidence "cast[ ] Connecticut Mutual in an unfavorable light[,]" there was no basis

for the court to find that all agents saw the video and "then made uniformly deceptive sales presentations." *Id.* at 216.

In the end, the court in *Cohn* concluded that plaintiffs failed to show that class treatment of their claims was appropriate and denied their motion for class certification.

Markarian has attempted to address the issues that precluded class certification in *Cohn* and the other federal cases by limiting his request for class certification to claims arising under Chapter 93A, which does not provide for a jury trial. *See, e.g., Nei v. Burley,* 388 Mass. 307, 446 N.E.2d 674, 677–80 (1983). Markarian also asserts that reliance is not an element of the Chapter 93A claim, which he asserts eliminates the need for individualized factfinding. *See, e.g., Trifiro v. New York Life Ins. Co.,* 845 F.2d 30, 33 n. 1 (1st Cir.1988) ("[R]easonable reliance is not absolutely necessary under c. 93A[.]"). Finally, Markarian has focused his argument on the alleged omission of material information from the Illustrations, which he contends will create a predominant common issue of fact.

Even though the narrowed proposed class and the recharacterization of this case as one of omission address some of the fatal flaws in other "vanishing premium" cases, the proposed class fails to satisfy the requirements of Rule 23. In particular, Markarian fails to satisfy the related elements of typicality and adequacy required by Rule 23(a)(2) and (a)(4), and the proposed class definition fails to satisfy the requirement of Rule 23(b)(3) that common facts or law predominate.

The facts established for present purposes include the following. Markarian first met with a Connecticut Mutual agent to discuss different types of life insurance products in May, 1987. The agent, Greg Kerkorian, was Markarian's childhood friend, and met with Markarian four or five times. Kerkorian's sales presentation to Markarian included an Illustration showing the amount and timing of premium payments, the dividends paid during the initial years of the policy, as well as other aspects of the policy.

Kerkorian prepared the Illustration using computer software that Connecticut Mutual provided to agents and insurance agencies that sold its products. Connecticut Mutual also provided annual updates for the computer software. The software allowed agencies to create Illustrations for their agents, and allowed agents who were comfortable using the computer to prepare their own Illustrations. The Illustrations demonstrated how the MPO policies would work over time and how the annual premiums might "vanish" if Connecticut Mutual's dividend level were to continue at the same level over the life of the policy.

The Illustration that Kerkorian showed to Markarian contained a disclosure that the dividend scale used in the Illustration was not guaranteed. It stated that:

DIVIDENDS, ANY INTEREST ON ACCUMULATIONS, AND ONE YEAR TERM COST ARE BASED ON THE 1987 DIVIDEND SCALE AND ARE NEITHER GUARANTEES NOR ESTIMATES FOR THE FUTURE. DIVIDENDS REFLECT CURRENT INVESTMENT, MORTALITY, EXPENSE AND FEDERAL INCOME TAX EXPERIENCE OF THE COMPANY.

In addition to this disclosure, the 1987 Illustration stated that, "BASE POLICY PREMIUMS ARE PAYABLE FOR LIFE."

Markarian's understanding about the policy came from reading the first page of the Illustration and from Kerkorian's oral description of the MPO policy. Markarian did not recall whether he read the entire Illustration, or whether he read the entire policy. In deciding whether to buy the MPO policy, Markarian relied on Kerkorian's advice and on the Illustration. Markarian also asked for and received his father's advice as to whether to purchase the MPO policy. In May, 1987, Markarian signed an application for a $100,000 whole life insurance policy. In May, 1995, two years after the premiums were to have "vanished," Markarian received a premium notice from Connecticut Mutual in the amount of $1,255.

Markarian asserts that Connecticut Mutual urged agents to sell MPO products even though it knew that it might not continue to earn sufficient interest to allow its customers to avoid premium payments. He claims that

Connecticut Mutual did not disclose this information to the agents or to prospective policyholders and, as a result, the policyholders purchased MPO products based on false assumptions about the "vanishing date" of their premiums.

As support for this assertion, Markarian points to Connecticut Mutual's Annual Statement Schedule M Supplements ("Schedule M forms"). The Schedule M forms describe how Connecticut Mutual calculated the annual dividends. The Schedule M forms also state that "[t]he dividend scale does not incorporate the use of projections or forecasts for any period in excess of two years." In spite of this limitation in the Schedule M forms, Markarian asserts that the Illustrations rely on annual dividends to calculate the "vanishing" dates for policyholders' premiums more than two years into the future. Markarian's Illustration, by way of example, used Connecticut Mutual's 1987 dividend scale to project his total net premium payments forward twenty years.

Markarian asserts that Connecticut Mutual's failure to disclose the dividend scales that formed the basis for the assumptions about future premiums was a material omission. Markarian also asserts that Connecticut Mutual had no reasonable basis to assume that the dividend scales used to create the Illustrations could be maintained and, in fact, knew that the policies would not perform as represented at the time of sale because the dividend scales could not be sustained.

However, the evidence demonstrates that Connecticut Mutual did not pay dividends solely from its annual earnings and that the Board had the discretion to allocate additional funds to support any given year's dividend scale. Moreover, the evidence also demonstrates that Connecticut Mutual did not know that any particular year's dividend level could not be maintained. Rather, the board determined the dividend levels on a year-by-year basis, using a number of different internal and external factors that fluxuated each year.

By characterizing the central issue as the omission of this information from the Illustrations, Markarian asserts that agents' oral representations to putative class members are not relevant because all policyholders were allegedly misled by the same omission. However, the evidence demonstrates that some, and perhaps many, policyholders were influenced by oral representations. Markarian submitted twenty-six complaint letters from Connecticut Mutual policyholders. Many of these letters state that the policyholders specifically relied on their agents' oral representations about the "vanishing" premiums.

For example, one letter states that the policyholder bought an MPO policy "after being told that after seven and a half years the dividends would self-fund the policy." Another letter states that "[t]he salesman ... had represented to us that the policy he was selling us from Connecticut Mutual would vanish in 8 years." Yet another letter states that the agent "explained that I could pay a higher premium, but would only have to pay for 7 years and then the premiums would be paid by the dividends." Another policy owner wrote that, "I was assured by [the agent] that the policy's dividends would begin paying the premiums at the end of the fourteenth year, which was reflected in the proposal ledger statement." Another policy owner was "assured that no additional premiums would ever have to be paid to maintain the guaranteed cash value or guaranteed death benefit." Indeed, Markarian himself testified that he relied on Kerkorian's representations and advice in deciding whether to purchase an MPO policy.

This evidence indicates that: (1) Markarian's present position that oral representations are not relevant to his legal claims is not typical of the class; (2) Markarian cannot adequately represent the interests of the class; and (3) an individualized evaluation of oral representations would be important to the ultimate determination of the merits of individual claims.

The evidence also demonstrates that agents did not receive common training or use a common sales script, which supports the conclusion that each agent presented different information to each policyholder. *See Jackson,* 193 F.R.D. at 511 (noting that the lack of uniform policies regarding use of the

illustrations and lack of a uniform sales script "led to great variance in representations made by brokers; some explaining away and others even exacerbating any misleading tendencies the policy illustrations may have had"); *Keyes,* 194 F.R.D. at 257 ("[T]here is substantial evidence that sales presentations differed from agent to agent, from client to client, and from transaction to transaction."); *Cohn,* 189 F.R.D. at 215 ("The Cohns have failed to demonstrate that all salespeople responded to these multiple variables in essentially the same fashion. Common sense dictates that they did not, particularly given the absence of a uniform training program. In addition, it is undisputed that sales illustrations were not always used."); *cf. In re First Commodity Corp. of Boston Customer Accounts Litig.,* 119 F.R.D. 301, 309 (D.Mass.1987) ("There is evidence here that suggests that First Commodity salespeople used standardized oral statements as part of a common course of conduct.").

Moreover, the information that Connecticut Mutual provided to the agents who sold its products changed over the proposed class period. For example, in a 1989 marketing document, Connecticut Mutual described different types of MPO products to agents and advised them that: "Dividends are based on the current scale and are not guaranteed for the future"; "[O]ut of pocket payments for the client will remain constant, provided the dividend scale doesn't decrease"; "The client's out-of-pocket payments will remain constant (assuming the dividend scale doesn't decrease)"; and "Out-of-pocket payments for the client will be zero, as long as dividends and/or ABO are sufficient to pay the premium due."

In 1990, Connecticut Mutual instructed agents that: "Whenever dividends are quoted, the must be accompanied by the statement, 'Based on the 19__ dividend scale, neither a guarantee nor estimate for the future.'" Responding to criticism of the "illustration game" in 1990, Connecticut Mutual "discuss[ed] the solution—leadership on the part of Connecticut Mutual agents, by providing insurance solutions based on conservative credited/dividend interest rate pro-

jections and past performance, rather than unrealistic projections into the future."

In 1991, Connecticut Mutual admonished agents that, "It is certainly appropriate to let your prospect know how much better the results will be if current performance levels continue; however, expectations should be based on the interest assumption that is consistent with your client's comfort level—in our example, 7.25%." Agents who read none, some, or all of the information that Connecticut Mutual distributed during the proposed class period would likely present different information about the benefits and risks of the MPO policy.

During the proposed class period, Connecticut Mutual also changed the disclaimer language in the Illustrations. In 1987, the Illustration contained the following disclosure:

> DIVIDENDS ... ARE BASED ON A VOTE BY OUR BOARD OF DIRECTORS. AMONG THE FACTORS THEY CONSIDER IN APPROVING A DIVIDEND SCALE ARE OUR INVESTMENTS AND OTHER EARNINGS, EXPENSES WE INCURRED, FEDERAL INCOME TAX EXPERIENCE OF THE COMPANY, EARNINGS TRANSFERRED TO SURPLUS AND MORTALITY OR MORBIDITY EXPERIENCE, ALL OF WHICH ARE SUBJECT TO CHANGE OVER TIME. SINCE DIVIDENDS ARE NOT GUARANTEED, THE AMOUNT YOU MAY HAVE TO PAY CAN VARY.

In 1988, Connecticut mutual added the following disclosure to the Illustrations:

> Illustrations present both guaranteed benefits and non-guaranteed dividends. It is important to keep these items in perspective and not lose sight of the promises that make up a life insurance policy .... Dividends are not the promises made in the life insurance policy. The premiums, death benefits, and cash values guaranteed by the contract are the promises .... We continue to make appraisals of future conditions, but we cannot say with any certainty what the future holds.

In 1991, the Illustration contained the following information:

Includes dividends which are neither guarantees nor estimates of dividends to be paid in the future. Values shown will go up or down if dividends change .... Change in dividends or actions by the policyholder can result in values differing from what is illustrated.

At your request, we have illustrated dividends based on our current dividend scale as well as dividends based on a purely hypothetical basis. Hypothetical dividends begin in year 2. With this hypothetical basis, only the interest rate has been changed. The hypothetical rate used is lower than the current dividend scale rate of 9.05%. All other factors remain the same. Future dividends are not guaranteed and are based on a vote by our Board of Directors.

In 1992, the Illustrations included the following language:

Any dividends, interest on accumulations and one year term costs are based on the 1992 Dividend Scale. These policy elements are not guaranteed and are not estimates of amounts to be paid in the future. Values shown will go up or down when the Dividend Scale changes.

Later in 1992, Connecticut Mutual once again changed the language in the Illustration to include additional disclaimers. These changes in the disclaimers demonstrate that each policyholder may have purchased their policy based on unique assumptions about the policy's performance. This finding contributes to the conclusion that individual issues predominate.

Causation is yet another example of the predominance of individualized issues. Although Chapter 93A does not require proof of reliance, it does require proof of causation. *See Sebago, Inc. v. Beazer East, Inc.,* 18 F.Supp.2d 70, 103 (D.Mass.1998) ("To establish a claim pursuant to ch. 93A, §§ 2 and 11, 'proof of actual reliance on a misrepresentation is not required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff.' "); *see also Varney v. Simpson,* No. 99–2159–D, 2000 WL 1460077, at *3 n. 1 (Mass.Super.Ct. Sept. 27, 2000) ("Actual reliance is not a required element of

a Chapter 93A claim."); *Fraser Eng'g Co., Inc. v. Desmond,* 26 Mass.App.Ct. 99, 524 N.E.2d 110, 113 (1988) (to establish a claim pursuant to Chapter 93A, "proof of actual reliance on a misrepresentation [is not] required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff"). Thus, common evidence of causation, not reliance, is a consideration in determining whether individual issues predominate.

Issues of individual reliance have contributed to the denial of class certification in many of the "vanishing premium" cases. *See, e.g., In re Jackson,* 193 F.R.D. at 509–11; *Adams,* 192 F.R.D. at 279; *Cohn,* 189 F.R.D. at 216–17. Similarly, the lack of common evidence of causation contributes to the denial of plaintiff's motion in the instant case. *See Sebago, Inc.,* 18 F.Supp.2d at 103.

When reliance rather than causation is the issue, federal courts have held in "vanishing premium" cases that the policyholder must establish that the alleged omissions were material. *See Rothwell,* 191 F.R.D. at 31. As in securities cases, materiality must be determined in the context of the total mix of information available to the purchaser. *See Rothwell,* 191 F.R.D. at 31 ("vanishing premium" case); *cf. TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (securities case); *Isquith v. Middle S. Util., Inc.,* 847 F.2d 186, 201 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988) (securities case).

The question of causation for Chapter 93A purposes must also be decided in the context of the total mix of information available to the purchaser of an insurance policy. In a Chapter 93A case, a plaintiff must prove "but for" causation and proximate causation. *Sebago, Inc.,* 18 F.Supp.2d at 84–85, 103. As this court wrote in *Sebago, Inc.*:

A defendant's breach of a legal duty is a cause in fact of the plaintiff's harm if that harm would not have occurred "but for" the breach. [*Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) ] (citing Restatement (Second) of Torts § 432(1)

(1965)). The second aspect of the causation analysis is proximate cause, the touchstone of which is foreseeability. The pertinent inquiry in determining the existence of proximate, or "legal," cause is "whether the conduct has been so *significant* and *important* a cause that the defendant should be held responsible." *Chisolm[ v. TranSouth Financial Corp.*], 95 F.3d [331,] 336 [ (4th Cir.1996) ] (quoting Prosser & Keeton on Torts § 42, p. 272 (5th ed.1984)).

18 F.Supp.2d at 84–85 (emphasis added).

In this case, as in *Rothwell,* "the policy illustration was not a stand-alone document, but rather was only one piece of the entire mix of information made available to each prospective policyholder." *Rothwell,* 191 F.R.D. at 31. As described earlier, in this case the statements in the Illustrations pro-. vided to members of the putative class were not uniform, oral representations were often involved, and some prospective purchasers, like Markarian, had independent sources of advice. Thus, the total mix of information made available to each purchaser was distinctive, if not unique, and the question of causation must be decided with regard to each purchaser in the context of the particular information that he or she received.

Contrary to plaintiff's suggestion, unsupported by any relevant, reported case law, it is not appropriate for the court to presume that an alleged omission was so significant as to have proximately caused a prospective purchaser to buy a policy from the defendant. It has been held in a "vanishing premium" case in which reliance and, therefore, materiality, were at issue that a court should:

> not assume that unexplained application provisions were material or conclusive to each class member's decision to purchase a vanishing premium policy. To the contrary, common sense dictates that, before the parties would fill out an application, the customer must be convinced to purchase a particular policy. Therefore, any detrimental reliance would occur during the agent's sales presentation and would be based on varying oral and written representations made prior to consideration of the application.

*Adams,* 192 F.R.D. at 279. This is equally true in the instant case in which causation and, therefore, the significance of a particular Illustration must be considered in the context of the different information presented to various prospective purchasers.

Accordingly, certification of the putative class is not appropriate because individual issues predominate. *See, e.g., Kent,* 190 F.R.D. at 278–80; *Cohn,* 189 F.R.D. at 215–18. Nevertheless, the court will address some of Markarian's remaining contentions.

Markarian asserts that the recent certification of a class of "vanishing premium" customers in *In re Lutheran Brotherhood Variable Insurance Products Company Sales Practices Litigation,* 201 F.R.D. 456 (D. Minn.2001) constitutes persuasive authority in support of his motion for class certification. However, the court in *Lutheran Brotherhood* decided that the "unusual breadth of Minnesota's consumer protection statutes" would permit the application of a "relaxed" causation requirement to the class claims. *Id.* at 461–64 (citing *Group Health Plan, Inc. v. Philip Morris, Inc.,* 621 N.W.2d 2 (Minn. 2001)). As described earlier, Chapter 93A also requires proof of causation. *See Sebago,* 18 F.Supp.2d at 84–85, 103. However, Markarian provides no Massachusetts authority or persuasive reason for the relaxation in this case of the causation requirement as this court described it in *Sebago, Inc.*

Many of the other cases on which Markarian primarily relies were decided by state courts which were applying standards and policies that are not applicable to the instant case. Most significantly, in *Varacallo,* the Appellate Division of the Superior Court of New Jersey emphasized that the "vanishing premium" cases denying class certification under federal law were distinguishable because New Jersey's "highest court has instructed trial courts to liberally allow class actions involving allegations of consumer fraud." 332 N.J.Super. 31, 752 A.2d 807, 814 (App.Div.2000). Therefore, under New Jersey law:

> Irrespective of whether the trial court may be required to deal with individual claims of reliance, causation, and/or damages, the

predominance factor has been met and class actions have been approved in this state where the court has found a common core of operative facts and the plaintiffs are seeking "to redress a 'common legal grievance.'"

*Id.* (internal citations omitted). As the court in *Varacallo* recognized, however, this is not the standard under federal law. *Id.* Similarly, in *Vos v. Farm Bureau Life Insurance Co.*, No. CL 78865 (Iowa Dist. Polk County Feb. 14, 2000), it was held that: "Trial courts are vested with the broad discretion in the certification of class actions. Thus, the court possesses considerable discretion in assessing what weight, *if any*, is to be given to the class certification criteria set forth in the Iowa Rules of Civil Procedure." *Id.* slip op. at 3. Under federal law, this court lacks such discretion.

There are two federal decisions on which Markarian relies which also deserve comment. A class was certified in a "vanishing premium" case in *In re Great Southern Life Insurance Co. Sales Practices Litigation*, 192 F.R.D. 212 (N.D.Tex.2000). In that case, the insurance company's home office developed all marketing materials provided to customers and the defendant's officers "acknowledge[d] that the policy illustrations were often based on inflated and not realistic performance models." *Id.* at 219. Assuming, without necessarily agreeing, that class certification was properly granted in that case, it is factually distinguishable because in the instant action the sales materials were not uniform and there is no admission that they were all improper in some important respect.

Finally, Markarian's reliance on *In re New England Mutual Life Insurance Co. Sales Practices Litigation*, 183 F.R.D. 33 (D.Mass. 1998) is misplaced. *In re New England* involved a class certified under Federal Rule of Civil Procedure 23(b)(1)(A) and 23(b)(1)(B),[2]

which do not require a finding that common questions of law or fact predominate. *Id.* at 40–43. In *In re New England,* the court expressly declined to decide whether class certification was appropriate under Rule 23(b)(3), which is applicable to the instant case. *Id.* at 43. Thus, in *In re New England* the court did not find that common issues of law or fact predominated. For the purposes of this case, in which Markarian seeks certification of a Rule 23(b)(3) class, he must prove such predominance. He has failed to satisfy that burden.

Because Markarian has failed to demonstrate that he is an adequate and typical class representative as required by Rule 23(a) and that common issues of law or fact predominate as required by Rule 23(b)(3), his motion to certify a class pursuant to Rule 23(b)(3) is being denied.

■ Markarian has also moved for class certification pursuant to Rule 23(b)(2). Rule 23(b)(2) states that an action may proceed as class action if:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]

Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Advisory Committee Note to 1966 Amendments to Rule 23. In fact, plaintiffs "may avail themselves of the rule only if injunctive or declaratory relief is the predominant remedy they seek." *Rothwell,* 191 F.R.D. at 29. In other words, if it is "readily apparent ... that [plaintiffs'] primary objective is money damages[,]" certification under Rule 23(b)(2) is not appropriate. *Id.*

---

**2.** Rule 23(b)(1)(A-B) states that:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible

standards of conduct for the party opposing the class, or

> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[....]

Markarian has requested the following forms of relief:

(a) damages;

(b) attorneys' fees and experts' fees;

(c) Chapter 93A treble damages;

(d) multiple and/or punitive damages;

(e) prohibition against Connecticut Mutual from cancelling putative class members' policies for failure to make premium payments; and

(f) equitable and/or injunctive relief, including specific performance, reformation, and imposition of a constructive trust "upon or otherwise restricting the proceeds of Connecticut Mutual's ill-gotten funds to ensure Plaintiff and Class members have an effective remedy".

Complaint at 46–47. All of the requested relief, except for that requested in sections (e) and (f), is monetary. The sole purpose of section (f) is "to ensure Plaintiff and Class members have an effective remedy."

It is apparent that Markarian's primary objective in this case is to recover money. Therefore, class certification pursuant to Rule 23(b)(2) is not justified.

V. ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. The motion for class certification (Docket No. 110) is DENIED.

2. Markarian shall, by September 7, 2001, inform the court whether he wishes to pursue or dismiss his individual claim.

3. If Markarian wishes to pursue his individual claim, a conference to schedule this case for completion shall be held on September 25, 2001, at 4:00 p.m.